[Civ. No. 8191. Third Dist. Dec. 17, 1952.]

HELEN KNIGHT SANCHA, Respondent, v. STANLEY ARNOLD, as Administrator, etc., Appellant.

Stanley Arnold in pro. per., Louis Ferrari, Sylvester Andriano and Theodore Cicoletti for Appellant.

Arthur J. Anderson and Hardin Barry for Respondent.

VAN DYKE, J.—This is an appeal by the administrator of the Estate of C. Sancha, deceased, from the judgment entered in favor of respondent, Helen Knight Sancha. Her action was brought to enforce specific performance of an oral contract entered into in May, 1926.

Concerning that contract and the relations of the parties thereafter, the trial court made the following findings: On May 1, 1926, in Reno, Nevada, respondent and Sancha entered into an oral contract whereby respondent on her part promised to become, and live with Sancha as "his common-law wife"; to devote all her attention exclusively to making a home for him; to assist him in the operation of a boarding and rooming house to be acquired by him in Susanville; to look after his general welfare and comfort so long as he should live

and to be and remain associated with him in the management and operation of the boarding and rooming house to be so purchased and acquired by him; that decedent on his part agreed with respondent that he would be ''her common-law husband and would live with her as her husband and in all respects be her husband''; that he would purchase and acquire the rooming and boarding house property and that the two would run a rooming and boarding house business; that Sancha would, upon his death, by will or otherwise leave respondent all of the property of which he was possessed when he died; that respondent accepted the terms and conditions of the oral agreement and fully and faithfully performed all her promises to decedent; that by the agreement it was stipulated that the property would be kept in the name of decedent, but upon his death, if he died first, would belong to respondent, and, conversely, if she died first would remain the property of decedent; that Sancha died without leaving any will or other instrument conveying the property to plaintiff. The court further found that in performance of her promises under the agreement respondent left the place where she had been working and thereafter devoted her entire life up to decedent's death, a period in excess of 24 years, in living with decedent ''as his common-law wife'' and that she actually and in good faith believed that she was his common-law wife; that during said period decedent lived with respondent as her common-law husband; that she assisted him in the conduct and management of the business during the entire period, working in the kitchen, preparing and serving meals and keeping the rooms; that all of the income of the two was derived from the conduct of the business jointly by them; that during all that time respondent received no wages or salary but did receive small amounts of money from time to time for her personal wants; that at the time of the agreement the laws of Nevada recognized the validity of common-law marriages; that the agreement was entered into by the parties voluntarily, each of his or her own account and without any undue influence or persuasion; that the agreement was in all respects just and fair and that the performance by respondent of her promises constituted adequate consideration therefor; that such services, owing to their peculiar nature, were incapable of pecuniary compensation and that it was never intended by the parties that they should be compensated in money; that respondent never received or asked money compensation for her services; that by her performance

of the contract and her reliance on the promises of decedent the respondent had so changed her condition in life that she could not be restored to the situation she occupied before the agreement was made; that the property which decedent owned at his death was the property concerning which the bargain had been made and accumulations therefrom; that by reason of the foregoing facts the respondent was the owner of all the property in the estate of Sancha.

Appellant contends that the oral agreement pleaded and found was in effect one to leave property by will and was therefore not enforceable; that the contract being one mutually to leave property by will, the respondent, by failing to keep in effect during the life of Sancha a will of her own, leaving her share of the property to Sancha, was guilty of such non-performance as to bar specific performance in her favor; that respondent's only remedy was in quantum meruit based upon a claim which the law required should have been filed in the estate proceedings.

It will be noted that the trial court did not expressly find that by reason of what occurred in Reno, Nevada, and the subsequent living together as man and wife of the parties to that agreement a marriage in fact existed. In this connection appellant argues that notwithstanding the statutes of Nevada, when the agreement was made, recognized the validity of common-law marriage, yet the respondent here failed to prove the existence of such a marriage. We think it was not necessary that the court should have found that a common-law marriage arose between the parties for the court did find all the essentials of a putative or supposed marriage which would justify the court in specifically enforcing the accompanying contract between the parties thereto concerning such property as they might thereafter acquire. Common-law marriages were valid under the statute law of Nevada as it existed in May, 1926 and up until 1943, when by amendment to the existing statutes Nevada for the first time required a ceremonial solemnization of marriage as a condition to its validity. The elements of a common-law marriage in May, 1926, under the Nevada statutes were stated by the Supreme Court of that state in *Dahlquist* v. *Nevada Industrial Com.*, 46 Nev. 107 [206 P. 197], as follows: "A marriage . . . of common-law . . . character is the consequence of a contractual relationship. . . . It is the result of present assent, between parties capable of contracting marriage, followed by subsequent cohabitation as husband and wife, and the holding out

to the world of each other as such.'' . (See, also, *Estate of Keig*, 59 Cal.App.2d 812 [140 P.2d 163].) ·

Respondent testified that while she was working in Susanville as chambermaid in a hotel being conducted by decedent and another she was told by decedent that he wanted to buy the rooming house property which thereafter was bought and that he then asked her if she would go into partnership with him in respect to such a business; that she told him then such an arrangement would be satisfactory to her; that thereafter and in Reno a further discussion occurred in which, after restating what had been said theretofore, it was proposed by Sancha and agreed to by her that they would return to Susanville and thereafter live together as husband and wife; that he would buy the rooming house property and whatever profit resulted from their running the same together would belong half to one and half to the other, but that if anything happened to Sancha she would get everything and if anything happened to her he would own all of the property. She testified further that upon their return to Susanville Sancha purchased the subject property; that she and Sancha began living together as husband and wife and so continued until his death; that during all of that period she believed herself to be his common-law wife and that she was married to him; that in reliance upon the agreement and in the belief that she was his wife she performed the usual duties of a wife and while he was the business head of the rooming house, boarding house, pool hall, cigar and newsstand business which they conducted she ran the boarding house, did all the cooking, ran the rooming house, doing all the housekeeping work in connection therewith and generally in all respects that each treated the other as husband and wife. Two witnesses who were intimate friends of the couple for many, many years testified that from the relationships which they observed they believed them to be married. Sancha declared during the life together of himself and respondent that when he died whatever he had would belong to her. We think the foregoing fully supports the findings of the trial court hereinbefore stated.

''It is well settled that a woman who lives with a man as his wife in the belief that a valid marriage exists, is entitled upon termination of their relationship to share in the property acquired by them during its existence. . . .

''The essential basis of a putative marriage, however, is a belief in the existence of a valid marriage. . . . In addition,

in the majority of cases, the de facto wife attempted to meet the requisites of a valid marriage, and the marriage proved invalid only because of some essential fact of which she was unaware, such as the earlier undissolved marriage of one of the parties . . . , a consanguineous relation between the parties . . . , or the failure to meet the requirement of solemnization.'' (*Vallera* v. *Vallera,* 21 Cal.2d 681, 683, 684 [134 P.2d 761].)

 In May of 1926, when common-law marriages were valid under the Nevada statutes, an agreement between a man and a woman otherwise capable of entering into the marriage state, that they then presently took each other as husband and wife, followed by cohabitation and a holding out to the world that they were husband and wife made a valid marriage. Appellant argues that there was no. proof here of the required cohabitation and holding out, but assuming this were so, yet what occurred in Nevada and what occurred thereafter in California sufficiently supported the trial court's finding that respondent during all of the years ensuing after the consensus that occurred in Nevada honestly and reasonably believed herself to be the wife of Sancha. This holding is supported by the following cases: *Santos* v. *Santos,* 32 Cal.App.2d 62 [89 P.2d 164], wherein the parties having obtained a license to marry believed that nothing more was necessary and failed to solemnize the marriage as required by the California code, and *Macchi* v. *La Rocca,* 54 Cal.App. 98 [201 P. 143], another case where the parties failed to properly solemnize a marriage after procuring a license to wed. It is not necessary, for one spouse to occupy the status of a putative spouse, that the other also believed the supposed marriage to be valid. (*Sanguinetti* v. *Sanguinetti,* 9 Cal.2d 95, 99 [69 P.2d 845, 111 A.L.R. 342].) Whether or not such belief on the part of respondent was held by her in good faith was a question of fact resolved in her favor by the trial court and such finding is supported by the evidence hereinbefore related.

It was held in *Estate of Krone,* 83 Cal.App.2d 766 [189 P.2d 741], that a putative spouse, upon the death intestate of the other member of the supposed marital community was entitled to take, as though it were the community property of a valid marriage, such property as the two had acquired. That rule, however, is not the basis of the judgment here appealed from, which rests rather upon an agreement between the parties to the supposed marriage. Concerning this

contract, the trial court made full findings as noted, finding also that the same had been fully performed by respondent and that specific enforcement thereof was necessary if justice were to be done. Precedent for this decision may be found in *Bacon* v. *Bacon,* 21 Cal.App.2d 540 [69 P.2d 884].

Indeed, it has been held that even where a putative marriage did not exist, yet a contract concerning property rights between a man and a woman living in meretricious relationship could be enforced if the illicit relationship was not so involved in the contract as to render it illegal. (*Garcia* v. *Venegas,* 106 Cal.App.2d 364, 368 [235 P.2d 89].)

See, also, *Vallera* v. *Vallera, supra,* where the court declared, at page 685:

"Plaintiff's lack of good faith in alleging the belief that she had entered into a valid marriage would not, however, preclude her from recovering property to which she would otherwise be entitled. If a man and woman live together as husband and wife under an agreement to pool their earnings and share equally in their joint accumulations, equity will protect the interests of each in such property. . . . Even in the absence of an express agreement to that effect, the woman would be entitled to share in the property jointly accumulated, in the proportion that her funds contributed toward its acquisition."

Where, as found by the trial court here, a woman has, justifiably believing herself to be married, entered into a contract with her supposed husband concerning property to be acquired by them thereafter, and in reliance thereon, and believing herself legally married, has labored with him for a quarter of a century in making the common living, receiving no wage or other compensation for her efforts, except what might ultimately prove to be the fruits of her labor, foregoing in the meantime all other opportunity of marriage or the conduct of a business of her own, she is not at the end of the time, when death has claimed the man she supposed to be her husband, to be turned off uncompensated, or relegated to her community rights or to a claim against the estate based solely on the value that may be ascribed to her toil as a domestic servant. On the contrary, she is entitled to and should receive in equity and good conscience the benefit of the bargain she justly and lawfully made. The decedent had agreed with respondent that if and when he died the property he agreed to acquire and

in the use of which she agreed to toil, together with what earnings the two could so accumulate, would belong to her. There can in equity be no just result save a decree specifically enforcing the agreement made.

 Appellant insists that the agreement was one which the law required to be in writing. Conceding this to be so, yet the facts found by the trial court clearly show that decedent would have been during his lifetime, and appellant is now, estopped from pleading the statute.

". . . The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract . . . , or in the unjust enrichment that would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute. . . . In many cases both elements are present. Thus not only may one party have so seriously changed his position in reliance upon, or in performance of, the contract that he would suffer an unconscionable injury if it were not enforced, but the other may have reaped the benefits of the contract so that he would be unjustly enriched if he could escape its obligations." (*Monarco* v. *Lo Greco*, 35 Cal.2d 621, 623, 624 [220 P.2d 737].)

 Appellant also argues that if there was no marriage then the contract was illegal because based in part upon a consideration of meretricious relations. The contention cannot be sustained because of the trial court's findings of justifiable and reasonable belief on the part of respondent that the relationship she entered into with decedent was that of wife, not that of paramour. Whatever Sancha may have believed, and upon this we have no express finding, as to whether or not he and respondent were legally married, she was not in pari delicto with him and equity therefore finds no obstacle to relief in the fact, if it be a fact, that these parties were not lawfully married.

 Finally, it was unnecessary that respondent, in order to perform her duties under the contract, keep in force a will in favor of Sancha. The property was all kept in his name and he needed no testamentary disposition of her share

to evidence his title, which rested on respondent's death, in their mutual contract.

The judgment is affirmed.

Peek, J., and Schottky, J. pro tem., concurred.

A petition for a rehearing was denied January 16, 1953, and the following opinion was then rendered:

BY THE COURT.—Appellant asks a rehearing on the ground that the recital of facts relied on by this court to support its judgment is erroneous in material respects. Other grounds are stated which we think we need not specially refer to. Petitioner states that the most serious error was committed when this court stated "that during all of that period she (respondent) believed herself to be his (Sancha's) common-law wife and that she was married to him." Says petitioner: "There is no evidence to support this statement. Neither respondent nor anyone on her behalf testified that she believed herself to be the wife of Sancha." On page 45 of the reporter's transcript the following questions were asked of respondent and the following answers given:

"Q. I think you said this morning that Sancha wanted you to live with him as his wife? A. That's right. Q. Over in Reno, was it? A. That's right. Q. When was that? A. In 1926. Q. From that time on what was the relationship between you and Sancha, the personal relationship? A. Man and wife. Q. In every respect? A. That's right. Q. What was your honest belief in regard to it? A. That we were really married. Q. That continued to the date of his death? A. That's right."

The petition continues with other assertions contrary to the record, but it is not necessary, we think, to do more than by the foregoing to illustrate the petitioner's carelessness in making these assertions. We have examined the record in the light of the charges made and think there is no foundation in the record for those charges.

Appellant's petition for a hearing by the Supreme Court was denied February 10, 1953. Schauer, J., was of the opinion that the petition should be granted.