283 P.2d 931

Carmen C. WARNER, Plaintiff-Appellant,

v.

Buell WARNER, Defendant-Respondent.

No. 8249.

Supreme Court of Idaho.

May 11, 1955.

A. A. Merrill, Idaho Falls, for appellant.

Jack G. Voshell, Edward W. Pike, Idaho Falls, for respondent.

TAYLOR, Chief Justice.

The parties were married in November, 1947, and divorced in February, 1948; married again in November, 1948, and again divorced June 5, 1950. During the course of this second marriage they adopted a boy, who at the time of the trial herein was five years of age. By the decree of June 5, 1950, custody was awarded to the mother (appellant) and the father (respondent) was ordered to pay $20 per month for child support.

Shortly after this divorce, plaintiff moved to California and later married one Crim, who obtained a divorce from her in June, 1951. In the early spring of 1951, while plaintiff was married to Crim, defendant went to California and "I primarily looked her up to see Spence [the child], but, as all things happen, we became affiliated." He spent two or three weeks with the plaintiff on that occasion. She told him she would divorce Crim and return to Idaho. In August, 1951, she came back to Idaho and entered the employ of the defendant in a club which he had opened in American Falls. This club was closed in October. Whereupon, plaintiff took up residence with the defendant at the South Fork Lodge in Swan Valley. During the winter of '51–'52 they lived as man and wife in North Hollywood, California, defendant during that time being employed by Lockheed. In April, 1952, they separated and defendant returned to Idaho. In December, 1952, plaintiff married one McCarley in Ely, Nevada.

In March, 1953, defendant again went to Los Angeles to see the plaintiff. Concerning this visit he testified:

"I spent several weeks with her again as a family. When she wasn't at my place, I was at her place. * * * I asked her to come back to Idaho and try it again, that I thought we still had enough between us to warrant one more attempt."

She agreed and in April, 1953, they returned to the South Fork Lodge in Swan Valley, where they thereafter continuously lived together as husband and wife until this action was commenced in August, 1954. During this time they held themselves out to the public as husband and wife and introduced each other, and publicly referred to each other, as such. Plaintiff testified that before they returned from California she asked defendant to help her to get a divorce from McCarley; that defendant promised her if she would come back to him he would marry her; he would be kind to her and the boy and not beat her anymore; that he would share with her the property he then owned and any property thereafter acquired; that relying upon these promises she returned and lived with him as his wife; that he was good to her about a month after their return, but thereafter pursued his previous course of cruelty, slapping her and striking her with his fist; that on several occasions she asked him to enter into a ceremonial marriage and that "if I ever mentioned it he got mad, and

usually slapped me around." As to the occasion which caused the final separation, she testified:

"Well, he—the last time he hit me he hit me in the head, and I couldn't hardly eat, or open my mouth, and he laughed and thought it was real funny, but it wasn't, and I decided that I am getting too old to take those beatings any longer, I can't take them."

"It knocked me down the last time he hit me. He hit me right here on the side of the head (Indicating). I had pains for about two months. I was even afraid he had injured me some way."

She did not leave immediately on this occasion, testifying:

"I thought I would wait and when he wasn't there and leave, I didn't want to get—He threatened to have— to beat me to where I wouldn't look presentable if I ever left, and I didn't— want to take that chance."

About a month later, while he was on a hunting trip, she left the home and commenced these proceedings. The court required the defendant to pay an attorney's fee of $150 and $75 for support of plaintiff pending the action.

About three weeks before the trial, having 'phoned plaintiff's father that he had come to see the child, the defendant went to the home of her parents in Twin Falls, Idaho, where plaintiff was then living.

The plaintiff took the child out to meet him in the street rather than risk a disturbance in the house. Concerning this occasion she testified that he jerked her into his car, leaving the boy in the street, and drove down to his hotel and demanded that she go to his room to sign a paper. Upon her refusal, he said:

"'All right, then, you take your choice, either I'll take you out in the country and beat the hell out of you, or you go in and do it.'"

Fearing him, she went to the room. As to what there occurred, she said:

"He wanted me to sign—write a letter and sign it calling this all off, and telling a bunch of—telling that it was a bunch of lies and everything, and I told him he could kill me first, so he just about did. He beat me up, and then left me in the hotel room with no money. I started down the street with my clothes half off, and some friend took me home. I was hysterical."

"* * * and beat me, and ripped my clothes off of me, and when I finally got home they had to take me to the doctor, and I lost my voice for three days."

Although this last beating occurred after the action was commenced and no supplemental complaint was filed, no objection to the testimony was made.

We also note as a part of this statement of facts that the defendant does not deny the beatings testified to by plaintiff.

The defendant testified that he did not know of the marriage to McCarley until after the parties had returned from California; that he had offered to help her to get a divorce in Idaho, but would not pay her expenses to California for that purpose. He denied any promise to share property with the plaintiff, and denied that he promised to marry her, and testified he did not consider her his wife. In conflict with this, he also testified:

"Q. Yes. And you—while you were there [California], and ever since, you have lived with her as husband and wife, haven't you? A. Yes, I believe it's been assumed by the public that we were man and wife.

"Q. Yes. And as a matter of fact, you held yourself out as man and wife since then, haven't you? A. I was proud to, yes.

"Q. Well, I am asking you if you haven't held yourself out as man and wife? A. Yes, I was proud to, yes.

"Q. * * * So that when you testified a moment ago that her folks upon several times—'my wife has been taken from me several times by her folks,' you considered Carmen as your wife, didn't you? A. Over a period of the last eight years, yes.

"Q. Yes, over a period of the last eight years you have considered her as your wife, that is correct; isn't it?

A. When she wasn't, I have waited for her, I. suppose."

One of defendant's witnesses, Levoy Peterson, a neighbor, testified that the parties held themselves out to the public as man and wife; that they introduced each other to various people as such, and that they acted as if they were man and wife "until last August"; that in July or August on an occasion when they were having an argument, he heard her say they were not married. This was apparently near the time of the trouble which brought on the final separation, which occurred in August. The other witnesses either did not testify on the subject or assumed the parties were husband and wife.

"Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations." § 32–201, I.C.

"Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases." § 32–203, I.C.

The evidence is quite conclusive that these parties entered in to the relationship of marriage by mutual consent and by mutual assumption of marital rights, duties, and obligations, insofar as they were capable. The trial court made no contrary finding on this issue, but found that "plaintiff remains married" to McCarley and "that the parties are in pari delicto in this case." In its conclusions of law the court held:

"III. That plaintiff and defendant did not marry or become husband and wife under the common law on or about March 27, 1953, or at any time since because of plaintiff's incapacity to consent to such a marriage by reason of the plaintiff being, then and now, already married to one Olvis B. McCarley and that such a marriage would be illegal and void from the beginning."

It is apparent that the trial court based its judgment in this case entirely upon want of capacity in the plaintiff, not upon a lack of consent or mutual assumption of marital rights. The evidence as to the McCarley marriage consists of certified copy of the marriage certificate, and plaintiff's admission on the witness stand. Plaintiff testified that she believed that marriage had been dissolved "according to what I hear"; that she did not know where McCarley was; and that she did not think he knew where she was; and that she had not been served with process in any divorce proceedings by him. For aught that appears in this record that marriage could have been dissolved by action of McCarley either before these parties resumed marital relations in March, 1953, or during the time they lived together as husband and wife. If McCarley obtained a divorce be-

-fore March, 1953, then there was no impediment to the marriage then agreed upon between these parties. If the impediment was removed during the period of their subsequent marital relationship, and they thereafter continued that relationship, then a common law marriage would result. Huff v. Huff, 20 Idaho 450, 118 P. 1080; Mauldin v. Sunshine Mining Co., 61 Idaho 9, 97 P.2d 608; Nicholas v. Idaho Power Co., 63 Idaho 675, 125 P.2d 321; Morrison v. Sunshine Mining Co., 64 Idaho 6, 127 P.2d 766; Jones v. Jones, 119 Fla. 824, 161 So. 836, 104 A.L.R. 1, and annotation 6.

■ The evidence is wholly insufficient to show that the impediment to plaintiff's marriage was not removed by death or divorce. The record being silent on that question, the presumption of the validity of her marriage to defendant is not overcome. Smith v. Smith, 32 Idaho 478, 185 P. 67; In re Estate of Tormey, 44 Idaho 299, 256 P. 535; Lea v. Galbraith, 64 Idaho 724, 137 P.2d 320; Osmak v. American Car & Foundry Co., 328 Mo. 159, 40 S.W.2d 714, 77 A.L.R. 722; Parker v. American Lumber Corp., 190 Va. 181, 56 S.E.2d 214, 14 A.L.R. 2d 1, and annotation p. 7; 34 A.L.R. 464, annotation; 77 A.L.R. 729, annotation.

In Smith v. Smith, supra, this court, copying a California quotation from Bishop on Marriage, Divorce and Separation, said:

" ' "Every intendment of the law leans to matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of proof, the law raises a strong presumption of its legality; not only casting the burden of proof on the party objecting (1 Bishop on Mar. Div. & Sep., §§ 946–948), but requiring him throughout, in every particular, to make plain, against the constant pressure of this presumption, the truth of law and fact that it is illegal and void." Id., § 956.' McKibben v. McKibben, 139 Cal. 448, 73 P. 143." Smith v. Smith, 32 Idaho 478, at page 481, 185 P. 67, at page 68.

And from the New York Court of Appeals:

" 'The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence.' Hynes v. McDermott, 91 N.Y. 451, at page 459, 43 Am.Rep. 677 * * *." Smith v. Smith, 32 Idaho 478, at page 482, 185 P. 67, at page 69.

The same principles were again stated in Mauldin v. Sunshine Mining Co., 61 Idaho 9, 97 P.2d 608. In the Mauldin case a common law marriage was established and

it was also shown that the complainant had been previously married. The record was silent as to whether either of the former spouses was dead or alive, or had been divorced. The court held the presumption of the validity of the common law marriage had not been overcome. In Nicholas v. Idaho Power, 63 Idaho 675, 125 P.2d 321, 325, the evidence was to the effect that the complainant wife prior to the marriage had filed an action for divorce from her prior husband; that the prior husband had made an appearance, and that no divorce had been granted in that action, which was dismissed. The court held that such evidence proved only that no divorce had been granted "in that action" and that such proof was insufficient to show either that no divorce was ever granted or that the former husband was alive on the date of the subsequent marriage. Quoting from 18 R.C.L. p. 420, the court further said:

"'Mere proof of a prior marriage and that one party had not obtained a divorce is not sufficient, for the other might have obtained such divorce and left him or her free to contract the second marriage.'" Nicholas v. Idaho Power Co., 63 Idaho 675, at page 684, 125 P.2d 321, at page 325.

The court further quoted from 38 C.J. at p. 1328:

"'In the case of conflicting marriage of the same spouse, the presumption of validity operates in favor of the second marriage. Accordingly the bur-den of showing the validity of the first marriage is on the party asserting it, and even where this is established *it may be presumed in favor of the second marriage that at the time thereof the first marraige had been dissolved either by a decree of divorce or by the death of the former spouse,* so as to cast the burden of adducing evidence to the contrary on the party attacking the second marriage.' (Italics supplied.)" Nicholas v. Idaho Power Co., 63 Idaho 675, at page 684, 125 P.2d 321, at page 325; See, also, 55 C.J.S., Marriage, § 43.

The case of Thomey v. Thomey, 67 Idaho 393, 181 P.2d 777, is in some respects parallel to this. There the parties entered into a common law marriage relationship, knowing that the plaintiff had a husband living. The defendant assured her that it "did not matter, that she could get a divorce later, and that whatever property was accumulated would belong jointly" to them. The parties lived together in such relationship for four years, at which time the wife procured a divorce from her first husband, after which they continued their relationship for nine years, without any marriage ceremony. The court held a common law marriage resulted. In that case the trial court concluded the defendant was estopped *to deny the existence and validity of his marriage to the plaintiff,* and its judgment was upheld by this court.

■ Here we think the defendant by his conduct is estopped to deny the validity of his marriage to plaintiff. It is evident that he wanted her to live with him as his wife. While the evidence is conflicting as to what, if any, promises he made to induce her to return, it is quite evident that he did persuade her to come back, and that his present denial of the marital relationship, and of any promise to share property, is actuated by his desire to deprive her of her property rights. It is also reasonable to conclude that she would not have returned without some inducement offered by him. In re Jackson's Estate, 112 Cal.App. 2d 16, 245 P.2d 684; Garza v. Fernandez, 74 Ariz. 312, 248 P.2d 869; Sancha v. Arnold, 114 Cal.App.2d 772, 251 P.2d 67, 252 P.2d 55; Cline v. Festersen, 128 Cal. App.2d 380, 275 P.2d 149. This conclusion of estoppel is further strengthened by defendant's conduct in living with the plaintiff as her husband after her divorce from Crim from about August, 1951, until April, 1952. Had it been in his interest to do so, he might have claimed a common law marriage arising out of this relationship as an impediment invalidating plaintiff's subsequent marriage to McCarley.

■ The fact that the relationship of the parties may have been meretricious in the beginning, or that they may have been in pari delicto, does not defeat her rights in the property accumulated during such relationship. A court of equity will protect the property rights of the parties in such cases, either according to their agreement in respect to property, or according to principles of equity and justice. Thomey v. Thomey, 67 Idaho 393, 181 P.2d 777; Vallera v. Vallera, 21 Cal.2d 681, 134 P.2d 761; Knoll v. Knoll, 104 Wash. 110, 176 P. 22, 11 A.L.R. 1391 and annotation 1394; In re Krone's Estate, 83 Cal.App.2d 766, 189 P.2d 741; Schneider v. Schneider, 183 Cal. 335, 191 P. 533, 11 A.L.R. 1386; Turknette v. Turknette, 100 Cal.App.2d 271, 223 P.2d 495; Garza v. Fernandez, 74 Ariz. 312, 248 P.2d 869; Sancha v. Arnold, 114 Cal.App. 2d 772, 251 P.2d 67, 252 P.2d 55; Union Bank & Trust Co. v. Gordon, 116 Cal.App. 2d 681, 254 P.2d 644; Stevens v. Anderson, 75 Ariz. 331, 256 P.2d 712; Bridges v. Bridges, 125 Cal.App.2d 359, 270 P.2d 69; Cline v. Festersen, 128 Cal.App.2d 380, 275 P.2d 149; Shore v. Shore, Cal., 277 P.2d 4; 31 A.L.R.2d 1255, annotation.

We conclude that the parties are husband and wife and that the plaintiff is entitled to a decree of divorce on the ground of extreme cruelty.

Both parties testified quite fully as to the character and value of property acquired subsequently to the marriage in March, 1953. This court has paramount discretion in the division and disposition of community property in case of divorce granted upon ground of extreme cruelty. § 32–714, I.C.; O'Brien v. O'Brien, 73 Idaho 64, 245 P.2d 785; Heslip v. Heslip, 74 Idaho 368, 262 P.2d 999; Jordan v. Jordan, 75 Idaho 512, 275 P.2d 669. The principal items of prop-

erty accumulated, on which from the evidence we have fixed the reasonable value, were a house in which the defendant invested $3,000 in materials and labor, in addition to his own labor, value $4,000; an outbuilding consisting of ladies' and men's rest rooms, and a wash-room for the convenience of guests at the lodge, value $1,000; some furniture, $85; gas stove, $40; two trailers, $325; a fish pond and stock of fish, $200; payments made on defendant's automobile $240; total $5,890. The buildings are located upon land leased from the government. The plaintiff is entitled to judgment for one-half of the above stated value of the accumulated property with a lien upon same for the payment thereof. In making this division, we have given consideration to testimony by the defendant that he owes $2,500 to the parties in whose names the two government leases are held, and which must be paid before he can acquire those leases in his own name, and that he has other debts aggregating $1,500.

The trial judge found that defendant was in arrears in the payment of child support money due under its decree of June 5, 1950, in the sum of $520, but concluded, in view of his holding that there was no marriage, that he was without jurisdiction to require the payment of $225 attorney's fee and temporary alimony previously ordered, and paid by the defendant. This sum the trial judge, therefore, deducted from the balance due plaintiff for child support. This deduction should not have been made and plaintiff should have judgment for the $520 unpaid.

The trial court found that it would not be for the best interests of the child to transfer his custody to plaintiff. The evidence on this issue is conflicting. The boy has continuously lived with the parties during the periods when they have resided together and neither has been shown unfit. However characteristics of each, and the circumstances and surrounding living conditions of each, causes grave concern for the welfare of the child. In view of the fact that in the trial of the case the trial court was principally concerned with the question as to whether or not there was a marital relationship existing which would give the court complete jurisdiction, it is possible that the issue as to custody was not as fully heard and considered as it otherwise may have been. For that reason we have concluded that the issue as to custody should be further considered by that court. The trial court is therefore directed to reopen the case and receive further evidence on that issue if either party desires to offer further evidence thereon, and upon further consideration thereof the court to determine which, if either, of the parties shall have custody, or make such other disposition, of the child as to the court shall seem in the child's best interests. If custody be awarded to the plaintiff, or any person other than defendant, a suitable allowance should be made for support of the child by defendant.

The judgment is reversed and the cause remanded with directions to enter judgment in conformity herewith.

Costs to appellant.

PORTER, ANDERSON and SMITH, JJ., concur.

KEETON, J., concurs in the conclusion reached.