287 P.2d 282 (1955)
In the Matter of the Death of Louis FOSTER.
Irene Daugharty FOSTER, Claimant-Appellant,
v.
DIEHL LUMBER COMPANY, Employer, and
Fireman's Fund Indemnity Company,
Surety, Defendants-Respondents.
No. 8182.
Supreme Court of Idaho.
July 12, 1955.
Rehearing Denied September 12, 1955.
*283 Stephen Bistline, Sandpoint, Brown & Peacock, Kellogg, for appellant.
H. J. Hull & Sons, Wallace, for respondents.
TAYLOR, Chief Justice.
On July 28, 1953, Louis Foster, then 57 years old, suffered a fatal accident arising out of and in the course of his employment by the respondent Diehl Lumber Company. Appellant, as his widow, filed a claim for death benefits in which she states the date of marriage as April 9, 1953. Prior to that date claimant had been a widow maintaining a home for herself and two minor sons at Clark Fork, where she also took in boarders. Her husband had died in 1945. The deceased Louis Foster's first wife had divorced him in 1944. In 1948 claimant and Foster began "keeping company" and in June, 1951, he moved into her home for board and lodging, paying her $25 a week. They had been talking of marriage for some time. On April 9, 1953, deceased received word that his daughter, living at Port Townsend, Washington, was ill. He invited claimant to accompany him on a trip by auto to visit his daughter. Claimant testified that on the trip they talked over the proposition of marriage and decided to get married; "but you don't get married in Washington in a hurry. We decided due to the fact that I am tied up in my former husband's property estate, we better wait." "At that time I was not quite sure of the laws on common law marriage." "I had heard of common law marriage but I thought we should go through a civil ceremony." "* * * he [deceased] told me it was exactly the same as a civil ceremony." This discussion occurred while they were considering the advisability of stopping overnight en route. Following this agreement, they stopped at a motel in Ellensburg, Washington, where the deceased registered them as Mr. and Mrs. *284 Foster; at Port Townsend they informed his daughter that they were going to be married. They stayed together at his sister's place in Seattle three days, then returned to Clark Fork, stopping again en route at a motel in Moses Lake, Washington, on the 13th; the deceased filled out the registration card in his own hand: "Mr. and Mrs. L. Foster, Clark Fork, Idaho", and introduced claimant to the proprietor as his wife. The card was placed in evidence as a part of the deposition of the motel proprietor. Claimant further testified that from April 9th to the day of his death she and Foster lived together as man and wife; he assumed the position of husband and head of the household; bought the groceries, cut the wood, made repairs and improvements in the house and acted as father and counsellor to her boys; they went to taverns, restaurants, dances and other places together where they acted and were received as husband and wife. In addition to claimant, eleven witnesses testified, and it was stipulated that eight others, produced by claimant, would similarly testify, that deceased and claimant held themselves out to the public as man and wife; that they were received and regarded by their friends and relatives as such; and in the community they were reputed to be husband and wife. The board notes in its findings that none of these had testified they introduced each other as husband and wife. Countering that, it appears both had lived many years in the small community of Clark Fork, and were there well known by those with whom they associated. There was no occasion for introductions, and none were testified to except the one at Moses Lake. Whether the eight who did not testify because of the stipulation would have added anything is conjectural, but as it stands, it is doubtful if the stipulation added any weight to claimant's case despite the fact that two of the proposed witnesses were relatives of claimant, one a brother of the deceased and one a member of the employer partnership. A sister, brother, and a sister-in-law of the deceased testified that after the trip in April, the deceased when invited to stay for a meal said he would have to go "home"; that he had to take his meals at "home"; and that "the missus will be waiting for me." His brother and sister-in-law congratulated the couple after their return, thinking they had been married while away. Such greeting was accepted by deceased without denial. These and others of Foster's relatives accepted claimant into the family as the wife of the deceased.
It is established by the record without contradiction that the deceased and claimant were of good character, were highly regarded in the community and were not persons of loose morals.
Opposed to appellant's evidence, respondent produced five witnesses on the proposition of their marital status in the community. The testimony of three of these was stricken on the ground they were not qualified to testify as to the marital reputation of the parties. One, Nygaard, testified the deceased and claimant were not reputed to be husband and wife. He had never heard they were husband and wife. He knew "they were together, more or less," but he did not know they were living together. One, Romayne Harwood, a bookkeeper for the employer, testified that in July, before his death, the deceased inquired about the deductions from his wages; that she called his attention to the fact that if he claimed some person as a dependent he could reduce the tax deduction, and he responded he could not do that because he was not married. However, she mailed his withholding statement to claimant after his death. She also testified she heard claimant and deceased were living together and were not married. It is not clear whether this was heard before or after the claim was filed by the widow.
Respondent introduced deceased's employee withholding exemption certificate made and signed by deceased June 1, 1953, in which he claimed only one exemption for himself, as a single person. It is apparent that the deceased's statement to the employer's bookkeeper, and the fact that he claimed only one exemption, were important, if not the dominant, items in the evidence inducing the decision of the board against claimant.
*285 Appellant urges that such statements being made without her presence or knowledge are inadmissible hearsay. We are not prepared to say their admission was error. Generally a man's denial of the marriage relationship has been regarded as self-serving. Mauldin v. Sunshine Mining Co., 61 Idaho 9, 97 P.2d 608, and Drawdy v. Hesters, 130 Ga. 161, 60 S.E. 451, 15 L.R.A.,N.S., 190 and case note 190-191. Cf. Thompson v. Nims, 83 Wis. 261, 53 N.W. 502, 17 L.R.A. 847. In the Georgia case the court held the declarations admissible, apparently under a pedigree statute, such as California's C.C.P. § 1870, sub. 4, making declarations of a deceased person in respect to relationship, including marriage, admissible. Our statute, § 9-408 I.C., limited to writings, makes declarations of decedents admissible when made against interest. The declaration in question, having the effect of increasing his tax, would appear to be against interest. Thus there would be a conflict between the self-serving aspect  the denial of the marriage in order to avoid its responsibilities  and his interest in lowering his tax.
However, for the purpose of this case we shall assume that the declarations were properly admitted. Even so, their effect is not sufficient to overcome claimant's proof of the marriage. The claim of only one exemption may have been entirely consistent with, and based upon an agreement between the husband and wife that she would claim her own exemption. His statement to the bookkeeper that he was not married is offset by his representation, in writing, to the motel proprietor that he was married, and by his introduction of her, and his holding her out to the public, as his wife. Also, it appears that both parties had in mind a subsequent ceremonial marriage when claimant's late husband's estate and property interests were settled and determined. Implicit in claimant's testimony is the idea that public pronouncement or record of the marriage could complicate estate and property settlements, and deceased may have been undertaking to cooperate with her in that regard. Her conduct in that respect is consistent with her testimony, it appearing that immediately upon receiving a quitclaim deed to her home from her deceased husband's relatives, she made a codicil to her will, in the presence of two witnesses, June 19, 1953, in which she gave "my husband, Louis Foster, a life lease to my home at Clark Fork."
The board found the relationship of the parties to be "a marriage per verba de futuro cum copula." We think this was error. Otherwise stated, that doctrine means "marriages through carnal intercourse after an agreement to be married in the future." 35 Am.Jur., Marriage, § 42. As such it has no application in this case. There is no reference in the record to carnal intercourse, nor is there any evidence that their relationship was carnal, in the sense of that doctrine. On the contrary, the record is that the parties were of good moral character and that their relationship was in no wise illicit or furtive, but was openly and publicly acknowledged as that of husband and wife. The record establishes their relationship as that of persons entirely without impediment, presently consenting to, and consummating a marriage by mutual assumption of marital rights, duties, and obligations, in full compliance with § 32-201 I.C. Their intention of later solemnizing the marriage by a civil ceremony could not operate to defeat the marriage already accomplished.
Citing decisions of the Supreme Court of Washington, the board found that a common law marriage contracted and consummated in that state is not recognized by the courts of that state. This was error. There was no proof of Washington law. In the absence of proof to the contrary the law of a foreign jurisdiction, where pertinent, is presumed to be the same as the law of the forum. Mason v. Pelkes, 57 Idaho 10, 59 P.2d 1087; Owen v. Taylor, 62 Idaho 408, 114 P.2d 258; Nicholas v. Idaho Power Co., 63 Idaho 675, 125 P.2d 321. But, assuming the marriage was consented to and consummated in the state of Washington, consent is a continuing thing, and it follows that the parties also consented to and consummated the marriage in Idaho upon their return. Warner v. Warner, Idaho, 283 P.2d 931.
*286 The board received in evidence a statement containing statistical data and family relationships given to the undertaker in which no wife or widow was mentioned and decedent's status was given as "divorced." It was not shown who gave this information to the undertaker, and it appears to have been given without the presence or knowledge of claimant. Its admission over objection is assigned as error. It was apparently given some weight by the board since it is referred to in the findings. It was clearly hearsay and its admission and consideration was error. Mauldin v. Sunshine Mining Co., 61 Idaho 9, 97 P.2d 608. While latitude is permitted the board in admission of evidence, its findings cannot be based on incompetent evidence. Wilson v. Standard Oil Co., 47 Idaho 208, 273 P. 758.
Appellant assigns the refusal of the board to receive in evidence a written notation made by the witness Harwood upon a statement of account which claimant received from the employer. In this writing the witness advised claimant she might be entitled to social security benefits as the widow of Louis Foster. The exhibit was not shown to the witness, nor was she asked concerning it, while she was testifying. As impeaching evidence it was properly rejected. § 9-1210 I.C. As an admission against interest by the employer, it does not appear that the bookkeeper could bind her principal in advising a debtor of his social security rights, in the absence of any evidence as to her authority, or of ratification by the employer.
Appellant seeks attorney fees under § 72-611 I.C. The board's finding that defendants did not deny claimant's status without reasonable ground is supported by competent evidence.
"`"The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. * * * Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence."'" Mauldin v. Sunshine Mining Co., 61 Idaho 9, at pages 17 and 18, 97 P.2d 608, at page 611.
Viewed in the light of this presumption, there is a want of substantial evidence to support the order of the board denying compensation to appellant. Nicholas v. Idaho Power Co., 63 Idaho 675, 125 P.2d 321; Morrison v. Sunshine Mining Co., 64 Idaho 6, 127 P.2d 766; Warner v. Warner, Idaho, 283 P.2d 931; §§ 32-201, 32-203 I.C.
The order is reversed and the cause remanded with instructions to make and enter an award in appellant's favor.
Costs to appellant.
PORTER and SMITH, JJ., concur.
KEETON, Justice (dissenting).
The issue presented in this case is whether appellant was deceased's common law wife.
Evidence submitted to support appellant's contention that she is entitled to widow's compensation may be summarized as follows: Appellant at all times herein pertinent was the widow of Murk Daugharty, deceased. In June, 1951, Foster, now deceased, moved into appellant's home as a boarder, paid $25 a week for board and lodging, and continued to live in her home until the time of his death. His status as a paying guest continued until September, 1952, or later. In April, 1953, appellant and deceased motored from Clark Fork to Seattle and Port Townsend, Washington. En route they stopped over night at Ellensburg and on the return trip at Moses Lake where, on April 13, 1953, they registered at a motel as Mr. and Mrs. L. Foster, Clark Fork, Idaho. Prior to the trip they had talked about getting married and on the trip the subject was discussed. Appellant testified: "We decided due to the fact that I am tied up in my husband's property estate, we better wait." and "We lived together as man and wife from April, 1953, until he was killed."
While in Port Townsend they discussed the contemplated marriage with deceased's daughter and son-in-law. Appellant testified: "We said we were going to be married and she (the daughter) said she was glad *287 we had made up our minds and that we would have a home together." Neither appellant nor deceased claimed at any of the places visited in Washington, or elsewhere, that they were married. After returning to Clark Fork from the sojourn to the coast: "He slept in my bedroom with me." Further:
"* * * he bought groceries. He maintained the house completely from the time we came back in April and he cut the wood. * * * He fixed the back porch and he did the gardening. He did everything a man of the family generally does * * * He made several improvements on the house * * *. He put in a new toilet in the bathroom and a roof on the north side of the house * * *."
In May, 1953, a son of claimant, David Daugharty, visited appellant's home and found his mother and deceased occupying the same bedroom. The explanation of this questionable situation was that they were planning on getting married and were staying together. They did not then or thereafter claim to be married.
The following additional evidence was introduced to sustain appellant's claim: Testimony of neighbors that they assumed appellant and Foster were married; a codicil to appellant's will, dated June 19, 1953, signed Irene Daugharty Foster, by the terms of which she devised to her husband, Louis Foster, a life estate in her home; appointment of appellant administratrix of the estate of deceased by the probate judge of Bonner County; and, testimony of certain witnesses that they regarded them as husband and wife. No witness testified that the deceased Foster, in the community in which he lived, or other places, ever introduced or acknowledged appellant as his wife. In fact, the only time the subject was mentioned to deceased, he denied it.
In opposition to the claim, witnesses testified that on June 1, 1953, when deceased made out for the employer income tax Form W-4, Employer's Withholding Exemption Certificate, he filled it out as a single man and did not claim to be married, and thereafter a bookkeeper for the employer, Mrs. Harwood, testified that in July, 1953, Foster told her he could claim no other dependent as he was not married. She testified: "I said: `You only have one dependent listed on your W-2. It would make quite a difference if you could list more than yourself.' He said: `Well, I can't, I am not married.'" Appellant was not listed as a dependent on the employer's withholding tax records. The information given to the undertaker regarding Foster's relatives did not list appellant as the surviving widow.
Neighbors who testified to a husband and wife relationship between appellant and deceased simply assumed the fact.
The Board found that cohabitation with a plan to be married in the future was insufficient to constitute a common law marriage, and ruled that there was no mutual consent to such marriage; and that the statement of appellant that the parties were going to get married or were planning to get married was insufficient to prove a marriage in praesenti.
Section 32-201 I.C. reads:
"Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations."
Before there can be a common law marriage both elements required by the statute must be shown to exist. First, a mutual consent of the parties; second, such consent must be followed by a solemnization or a mutual assumption of marital rights, duties and obligations. If either element is lacking, there is no marriage.
The Board in its determination of the matter specifically found that there was no mutual present consent to marriage and therefore appellant was not the widow of the deceased. Nowhere in the record is it established that Foster or appellant ever consented to the alleged marriage.
The making of the codicil to the will was not shown to ever have been brought to the attention of the deceased or that he consented *288 thereto, and after the codicil was prepared and signed he stated positively to the bookkeeper of the employer that he was not married.
Were we to conclude that the evidence to support the claim of the marriage is in conflict, nonetheless there is sufficient competent evidence to support the findings of the Board, and where such findings are supported by substantial evidence, they are controlling on appeal and will not here be disturbed. Art. 5, § 9, Idaho Constitution; Stralovich v. Sunshine Mining Co., 68 Idaho 524, 201 P.2d 106. In the latter case, this Court held:
"Where there is any competent and substantial evidence to support findings of Industrial Accident Board, findings will not be disturbed by the Supreme Court."
Viewing the evidence in the light most favorable to appellant, it discloses that the parties had talked about and planned on getting married some time in the future. In the meantime they were cohabiting together. Circumstances of habit or repute do not establish a marriage.
The fact that they registered as man and wife while at Moses Lake, Washington, wholly fails to disclose more than a convenient arrangement for spending the night.
The appointment of appellant as administratrix of the estate of the deceased is of no importance. It was a matter occurring after the deceased's death in which he had no part, and so far as the records show it was entirely an ex parte proceeding, her appointment not being contested.
An agreement to cohabit for the present and to marry later is not a marriage although there is cohabitation. There can be no contract per verba de praesenti where the marital status is to become fixed in the future. 35 Am.Jur. 209, Sec. 41.
The order of the Board should be affirmed.
ANDERSON, J., concurs in this dissent.