[No. B016594. Second Dist., Div. Three. June 30, 1988.]

In re the Marriage of FERESHTEH R. and SPEROS VRYONIS, JR.
FERESHTEH R. VRYONIS, Respondent, v.
SPEROS VRYONIS, JR., Appellant.

**COUNSEL**

Richard A. Love, Reish & Luftman and Duane A. Dauphine for Appellant.

Pamela C. Sellers and Lorraine Loder for Respondent.

**OPINION**

**KLEIN, P. J.**—Appellant Speros Vryonis, Jr. (Speros) purports to appeal a judgment on bifurcated issues[1] wherein the trial court held respondent Fereshteh R. Vryonis (Fereshteh) had the status of a putative spouse.

Because Fereshteh reasonably could not believe she was validly married under California law, we order the issuance of a peremptory writ.

---

[1] Regardless of the formal appearance of the instant "Judgment on Bifurcated Issues," it was nonappealable. The judgment is interlocutory in its effect, as the property division issues remained to be tried. (Code Civ. Proc., § 904.1; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 67, p. 91.) Although judgments on *collateral* matters in bifurcated trials are separately appealable (*In re Marriage of Van Sickle* (1977) 68 Cal.App.3d 728, 735 [137 Cal.Rptr. 568]; *In re Marriage of Fink* (1976) 54 Cal.App.3d 357, 362 [126 Cal.Rptr. 626]), the trial court's ruling herein pertained to the central issues of the litigation. However, this is not a situation where the time for appealing from a final judgment has expired. (See *In re Marriage of Patscheck* (1986) 180 Cal.App.3d 800, 804 [225 Cal.Rptr. 787].) Further, the matter has been fully briefed, issues of continuing interest are presented, and the entire litigation is resolved by our review. Therefore, a dismissal would be unnecessarily dilatory and circuitous. (*Olson v. Cory* (1983) 35 Cal.3d 390, 400-401 [197 Cal.Rptr. 843, 673 P.2d 720].) Accordingly, we treat the matter as a petition for writ of mandate. (*Ibid.*)

### FACTUAL & PROCEDURAL BACKGROUND [2]

Speros was the director of and a teacher at the Center for Near Eastern Studies at UCLA. Fereshteh was a visiting professor at the center, and the parties met there in the fall of 1979. She was an Iranian citizen, a member of the Shiah Moslem Twelve Imams religious sect, and involved in the local Islamic community. Speros was a nonpracticing member of the Greek Orthodox Church.

Prior to arriving in the United States in 1979, Fereshteh spent six years in England, where she earned a Ph.D. at Cambridge University. She had been married before and was the mother of two children.

The parties saw each other occasionally during 1980 and 1981 in connection with center activities. They dated in February and March of 1982, but Fereshteh repeatedly stated she could not date Speros without marriage or a commitment because of her strict religious upbringing. Speros responded he could not marry as he did not know her and that he was a "free man."

Nonetheless, on March 17, 1982, at her Los Angeles apartment, Fereshteh performed a private marriage ceremony. According to Fereshteh, the marriage conformed to the requirements of a time-specified "Muta" marriage, authorized by the Moslem sect of which she was an adherent. Fereshteh was unfamiliar with the requirements of American or California marriage law. However, she believed the ceremony created a valid and binding marriage, and Speros so assured her.

The parties kept the marriage secret and did not hold themselves out as husband and wife. All indicia of marriage were lacking. The parties did not cohabit, but rather, maintained separate residences. They did not inform relatives or friends of the marriage. Speros did not have a key to Fereshteh's apartment, and Fereshteh only had a key to Speros's house for three months. Speros continued to date other women. Fereshteh did not use Speros's surname. The parties did not commingle their finances, nor did they assume any support obligations for one another. They did not take title to any property jointly. During the period of time in question, Speros and Fereshteh filed separate tax returns, each claiming single status. They spent 22 nights together in 1982, only a few in 1983, and none in 1984.

On frequent occasions, Fereshteh requested Speros to solemnize their marriage in a mosque or other religious setting, which Speros refused.

In July 1984 Speros informed Fereshteh he was going to marry another woman, after which time Fereshteh began informing people of the purport-

---

[2] The evidence is set forth in the light most favorable to the judgment. (*Gyerman* v. *United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1 [102 Cal.Rptr. 795, 498 P.2d 1043].)

ed marriage. In September 1984, about two and one-half years after the date of the private marriage ceremony, Speros married the other woman.

Fereshteh thereafter petitioned for dissolution on October 15, 1984, seeking attorney's fees, spousal support and a determination of property rights. Speros moved to quash the summons based on lack of jurisdiction in that a marriage did not exist. The motion was denied. The trial court held a bifurcated hearing in March 1985 to determine first the validity of the marriage and putative spouse status.

In the statement of decision and judgment on bifurcated issues, the trial court held Fereshteh had a good faith belief a valid marriage existed between her and Speros, and specifically found: "3. On March 14, 1982, in Los Angeles, California, the Petitioner performed a private religious marriage ceremony between herself and the Respondent which conformed to the requirements of a Muslim Mota [sic] marriage. [¶] 4. No marriage license was obtained. And only the Petitioner and Respondent were present during the ceremony. No written documents were made to declare or record or otherwise authenticate the existence of a marriage between the parties, either at the time of the ceremony or thereafter. [¶] 5. The Respondent required the Petitioner to keep the marriage secret and to live in a separate residence. [¶] 6. The Petitioner believed in good faith that a valid marriage existed as a result of the ceremony, the consent expressed by Respondent, Respondent's subsequent actions, and statements of the Respondent. [¶] 7. The Petitioner had no knowledge of the marriage laws of California and was ignorant as to any impediment to the validity of the marriage and justifiably relied on Respondent's assertions that the Petitioner and Respondent were husband and wife. [¶] 8. On March 14, 1982, when the marriage ceremony was performed, the Respondent stated his consent to the marriage but did not intend such statements and participation in the ceremony to constitute a valid California marriage. [¶] 9. The ceremony performed between the parties on March 14, 1982, did not constitute a valid California marriage due to the Respondent's lack of intention that such ceremony constituted a valid marriage and due to the subsequent lack of recordation or authentication of such marriage ceremony. [¶] 10. The Petitioner has the status of a putative spouse . . . ."

The finding of putative marriage would allow Fereshteh in subsequent proceedings to assert claims for spousal support and property division. The trial court ordered Speros to pay $10,000 as a partial contributory share of Fereshteh's attorney's fees.

Speros filed the purported appeal.

### CONTENTIONS

Speros contends: (1) the trial court erred as a matter of law in finding putative spouse status because (a) there was no evidence of a void or void-

able marriage in that neither party made any attempt to comply with the statutory requirements of solemnization and recordation, and (b) there was no objective evidence to sustain the finding of Fereshteh's good faith belief in the existence of a valid marriage without the existence of the usual indicia of a marriage; (2) the ruling in effect resurrects common law marriage, contravening public policy; and (3) it was error to allow Fereshteh to testify as an expert regarding Islamic custom and practice and the Muta marriage.

## DISCUSSION

1. *General principles of putative marriage doctrine.*

Civil Code section 4100[3] defines the marriage relationship as "a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary. Consent alone will not constitute marriage; it must be followed by the issuance of a license and solemnization as authorized by this Code, . . ."

Section 4200 sets forth the procedural requirements for a valid California marriage as one which "must be licensed, solemnized,[4] authenticated, and the certificate of registry of marriage filed as provided in this article; but noncompliance with its provisions by others than a party to a marriage does not invalidate it."

▪ Where the marriage is invalid due to some legal infirmity, an innocent party nevertheless may be entitled to relief under the long recognized protections of the putative marriage doctrine. Said doctrine was codified in section 4452, enacted in 1969.

Section 4452 sets forth the rights of a putative spouse as follows: "Whenever a determination is made that a marriage is void or voidable and the court finds that either party or both parties believed in good faith that the marriage was valid, the court shall declare the party or parties to have the status of a putative spouse, and, if the division of property is in issue, shall divide, in accordance with Section 4800, that property acquired during the union which would have been community property or quasi-community property if the union had not been void or voidable. The property shall be termed 'quasi-marital property'."

In addition to enjoying property rights in the nature of those afforded marital partners (§§ 4452, 4800), a putative spouse may also obtain spousal support. (§ 4455.)

---

[3] All statutory references are to the Civil Code, unless otherwise indicated.
[4] Solemnization denotes a ceremony wherein the parties declare, in the presence of the person solemnizing the marriage, that they take each other as husband and wife. (§ 4206.)

## 2. *Requirement of a void/voidable marriage construed to mean invalid marriage.*

As set forth *ante,* section 4452 requires a threshold determination of a void or voidable marriage.

A void marriage is an incestuous (§ 4400), bigamous or polygamous one. (§ 4401.) A voidable marriage is defined as one where there was (a) no capacity by one party to consent due to youth or unsoundness of mind, (b) fraudulently or forcibly obtained consent, (c) physical incapacity of entering into a marriage, or (d) a living spouse of either party who has been absent five years or more and believed dead. (§ 4425.)

The circumstances here do not give rise to either a void or a voidable marriage. However, that in and of itself does not preclude relief under the putative marriage doctrine. A fact situation may involve neither a void nor a voidable marriage, and yet relief is afforded, based upon the reasonable expectations of the parties to an alleged marriage entered into in good faith.

The void or voidable requirement of section 4452 was interpreted by *In re Marriage of Monti* (1982) 135 Cal.App.3d 50 [185 Cal.Rptr. 72]. In that case, Shirley and Clifford were married in Ohio in 1957, and a final divorce decree was entered in that state two years later. However, shortly before entry of the final decree, Shirley and Clifford reconciled. Thereafter, they moved to California where they lived and worked together and raised a son. In 1981, the parties separated and Shirley filed a petition for dissolution of marriage. (*Id.,* at pp. 52-53.)

In a supporting declaration Shirley asserted putative spouse status, stating: upon their reconciliation in 1959, she asked Clifford whether they had to do anything about the divorce proceedings; Clifford replied nothing would happen unless he made an appearance in court; as a result, she continued to believe they were still married; it was only in 1981 that she learned there had been a final decree entered in Ohio. (135 Cal.App.3d at p. 53.)

The trial court ruled the Montis' marriage was terminated in 1959, and the parties thereafter did not enter, or purport to enter, into any other ceremony of marriage; therefore, there was no void or voidable marriage between the Montis and, consequently, Shirley was not a putative spouse. (*Id.,* at p. 54.)

The *Monti* court held section 4452 merely codified the substantive case law existing before 1969 defining a putative spouse. (*Id.,* at p. 55.) Before that time, it was well settled the essential basis of a putative marriage was a belief in the existence of a valid marriage. (*Vallera* v. *Vallera* (1943) 21

Cal.2d 681, 684 [134 P.2d 761]; *In re Marriage of Monti, supra,* 135 Cal.App.3d at p. 55.) Section 4452 was merely declaratory of existing law and not intended to work significant substantive changes. (*In re Marriage of Monti, supra,* at pp. 54-55.)

With due consideration to the intent of the Legislature in adding section 4452, the *Monti* court held Shirley had alleged sufficient facts to form the essential basis of a putative marriage. (*Id.,* at p. 56.) The trial court's dismissal of Shirley's petition on the ground she was not a putative spouse due to the lack of a void or voidable marriage was held erroneous. (*Ibid.*)

*Monti* thereby implicitly recognized the codification of the putative marriage doctrine in section 4452 was not intended to narrow the application of the doctrine only to parties to a void or voidable marriage. Instead, the Legislature contemplated the continued protection of innocent parties who believe they were validly married.

Were section 4452 limited to situations where a marriage is void or voidable as those terms are defined by statute (§§ 4400, 4401, 4425), the putative marriage doctrine would cease to apply to many invalid marriages.

Because in enacting section 4452 the Legislature intended merely to declare existing law, we construe the void/voidable aspect as simply requiring a threshold determination that a legal infirmity in the formation renders a marriage invalid.

In the instant case, the purported marriage was plainly defective.

3. *Inquiry into good faith belief in a valid marriage.*

Fereshteh seeks affirmation of the trial court's finding she had a good faith belief she was validly married to Speros, urging the only necessary finding to establish putative marriage is that one spouse believed in good faith a valid marriage existed.

Speros urges more than a "good faith belief, however wild" is required. He posits the requisite state of mind must be a good faith belief in a valid California marriage, and that there must also be some objective indicia of a valid marriage by which to measure such belief.

It is unclear from the statement of decision whether the trial court found Fereshteh believed she had celebrated a valid Muta marriage and held thereby a belief sufficient to confer putative spouse status, or whether the trial court determined Fereshteh had a good faith belief she was validly married under California law.

If the trial court based its putative marriage finding on Fereshteh's belief she had celebrated a valid Muta marriage, the ruling was error be-

cause the required good faith belief is in the existence of a lawful California marriage. If the trial court found Fereshteh had a good faith belief she was validly married under California law, the ruling was error because the requisite good faith belief must have a reasonable basis.

a. *Good faith belief must be objectively reasonable.*

While a trial court may be tempted to base a finding of putative spousal status merely on the subjective good faith in a valid marriage held by a credible and sympathetic party, more is required. ■ "Good faith belief" is a legal term of art, and in both the civil and criminal law a determination of good faith is tested by an objective standard.

In *Russ Bldg. Partnership v. City and County of San Francisco* (1988) 44 Cal.3d 839, 853 [244 Cal.Rptr. 682, 750 P.2d 324], the following language is pertinent: "A vested right requires more than a good faith subjective belief that one has it." In *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 924 [216 Cal.Rptr. 345, 702 P.2d 503], the court observed: "The recent decision in *Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128 [191 Cal.Rptr. 849], offers an analogy to the present litigation. Hertz's car rental agreement permitted it to determine unilaterally the price charged for gas used to fill the tanks of returned rental cars. Plaintiff's suit alleged that Hertz fixed unreasonably high prices, in breach of its duty of good faith and fair dealing. Discussing this cause of action, the court said that '[t]he essence of the good faith covenant is objectively reasonable conduct. Under California law, an open term in a contract must be filled in by the party having discretion within the standard of good faith and fair dealing.' (P. 141.)" (Italics added.)

Strong language is used in *Theodor v. Superior Court* (1972) 8 Cal.3d 77, 98, footnote 13 [104 Cal.Rptr. 226, 501 P.2d 234], dealing with a search warrant issue, to make the point: " 'If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' (*Beck v. Ohio* (1964) 379 U.S. 89, 97 [13 L.Ed.2d 142, 148, 85 S.Ct. 223].) 'Good faith . . . is immaterial, and cannot serve to rehabilitate an otherwise defective warrant.' (*Lockridge v. Superior Court, supra,* 275 Cal.App.2d 612, 622.)"

In discussing the question of probable cause, *People v. Ruggles* (1985) 39 Cal.3d 1, 9 [216 Cal.Rptr. 88, 702 P.2d 170], stated: "The probable cause determination that will validate a warrantless search of defendant's vehicle must be based on *objective facts that could justify the issuance of a warrant by a magistrate* and not merely the subjective good faith of the police officers."

Without question, the hallmark of the law is reasonableness, and " '[r]easonableness,' of course, is an objective standard, requiring more than good faith." (*In re Arias* (1986) 42 Cal.3d 667, 696 [230 Cal.Rptr. 505, 725 P.2d 664].)

■ A proper assertion of putative spouse status must rest on facts that would cause a reasonable person to harbor a good faith belief in the existence of a valid marriage. Where there has been no attempted compliance with the procedural requirements of a valid marriage, and where the usual indicia of marriage and conduct consistent with a valid marriage are absent, a belief in the existence of a valid marriage, although sincerely held, would be unreasonable and therefore lacking in good faith.

While solemnization is not an absolute prerequisite to establishing a putative marriage (*Wagner* v. *County of Imperial* (1983) 145 Cal.App.3d 980, 983 [193 Cal.Rptr. 820]; *Santos* v. *Santos* (1939) 32 Cal.App.2d 62 [89 P.2d 164]), it is a major factor to be considered in the calculus of good faith. Without some diligent attempt to meet the requisites of a valid marriage (*Miller* v. *Johnson* (1963) 214 Cal.App.2d 123, 126 [29 Cal.Rptr. 251]), a claim of good faith belief in a valid marriage would lack any reasonable basis.

Consideration of such factors provides a framework for determining whether a petitioner had reason to believe a valid marriage existed. Lacking a reasonable basis for an alleged good faith belief, even an honestly held belief in the existence of a valid marriage will not be in good faith and therefore insufficient to come within section 4452.

(i). *Application here.*

■ Fereshteh testified her belief in the validity of the purported marriage rested on her having performed the Muta ceremony, combined with Speros's assurances the marriage was valid.

As indicated, Fereshteh performed a private marriage ceremony at her apartment, with only the two of them present. The ceremony was not solemnized by a third party. No license was obtained and there was no authentication or recordation. In short, there was no attempt to meet the statutory requirements of section 4200 with respect to the formation of a valid California marriage.

Because the parties made no colorable attempt at compliance, Fereshteh could not believe reasonably a valid California marriage came into being. Fereshteh's ignorance of the law does not compel a contrary conclusion. Further, her reliance on Speros's assurances is unavailing. Unlike *Monti,* wherein Shirley relied on Clifford's statement that the divorce dissolving

their undisputably valid marriage was never finalized (*In re Marriage of Monti, supra,* 135 Cal.App.3d at p. 53), there was no endeavor here to comply with legal formalities.[5]

Subsequent events are not germane to whether there was a proper effort to create a valid marriage in the first instance. However, later conduct sheds further light on whether Fereshteh had reason to believe she was married to Speros. We observe the parties did not reside together, but continued to maintain separate households. They did not assume any support obligations for one another. They spent no more than five or six nights together in any given month during the marriage. Speros continued to date other women, of which fact Fereshteh was aware. Fereshteh did not use Speros's name. There was no merging of finances, nor was there any joint accumulation of real or personal property. Fereshteh and Speros filed separate tax returns, each claiming single status. For the two and one-half year period following the purported marriage, the parties did not hold themselves out as husband and wife. It was only when Speros told Fereshteh he was to be married that Fereshteh published the fact of their purported marriage.

In sum, the alleged private marriage went unsolemnized, unlicensed and unrecorded. Thereafter, the parties did not cohabit, or hold themselves out as husband and wife, and in no way approximated the conduct of a married couple. Because the facts were at odds with the formation and existence of a valid marriage pursuant to California law, Fereshteh could not rely on Speros's statements reasonably to believe she was married. Notwithstanding Fereshteh's sincerity, her belief was unreasonable and therefore not in good faith.

b. *Required belief in valid marriage construed to mean lawful marriage.*

As noted, the trial court may have based its finding of putative spouse status on Fereshteh's belief she had conducted a valid *Muta* marriage.

---

[5] We are aware of *In re Marriage of Recknor* (1982) 138 Cal.App.3d 539, 544-547 [187 Cal.Rptr. 887, 34 A.L.R.4th 805], which held a woman did not qualify as a putative spouse because she *knew* at the time she entered into the second marriage her first marriage had not yet been dissolved, but she was entitled to recover support and attorney's fees because the man was estopped from denying the validity of their 15-year marriage. It appears *Recknor* failed to give due consideration to an essential element of estoppel, namely, the party asserting it must have been ignorant of the true state of facts. (*LaRue* v. *Swoap* (1975) 51 Cal.App.3d 543, 551 [124 Cal.Rptr. 329].)

In order to prove this element, " 'it is necessary that the evidence show not only that the party claiming the estoppel did not have actual knowledge of the true facts but that he did not have notice of facts sufficient to put a reasonably prudent [person] upon inquiry, the pursuit of which would have led to actual knowledge; the convenient or ready means of acquiring knowledge being the equivalent of knowledge [citations].' " (*Ibid.*)

Notwithstanding Speros's assurances, because Fereshteh was on notice the purported marriage was defective, estoppel does not lie.

However, case law reflects the requisite belief is in a *lawful* marriage, that is to say, a marriage which complies with statutory requirements.

*Schneider* v. *Schneider* (1920) 183 Cal. 335, 339 [191 P. 533, 11 A.L.R. 1386], recognized the putative marriage doctrine serves to protect persons domiciled in a community property state who "believ[ed] themselves to be *lawfully* married to each other, . . ." (Italics added.) Along similar lines, *Feig* v. *Bank of Italy etc. Assn.* (1933) 218 Cal. 54, 58 [21 P.2d 421], held a plaintiff who "innocently and in good faith believed himself at all times to be the *lawful* husband of the decedent" was entitled to an equitable apportionment of their gains. (Italics added.)

Two years before *Feig,* in *Flanagan* v. *Capital Nat. Bank* (1931) 213 Cal. 664, 666 [3 P.2d 307], the essential basis of recovery under the doctrine was stated as a bona fide belief "in the existence of a *valid* marriage." (Italics added.) "Lawful" and "valid" are nearly synonymous,[6] and subsequent cases tended to use the latter term in enunciating the doctrine, as does section 4452. (See e.g. *Vallera* v. *Vallera, supra,* 21 Cal.2d at p. 684; *Estate of Krone* (1948) 83 Cal.App.2d 766, 768 [189 P.2d 741]; *Estate of Long* (1961) 198 Cal.App.2d 732, 738 [18 Cal.Rptr. 105]; *In re Marriage of Monti, supra,* 135 Cal.App.3d at pp. 55-56.)

Although in many situations, there is little practical difference between lawful and valid, the use of the latter term in this context may engender confusion. ■ The putative marriage doctrine protects the expectations of innocent parties who believe they are *lawfully* married. (*Schneider* v. *Schneider, supra,* 183 Cal. at pp. 339-340.) When the basis of the doctrine is stated as a good faith belief in a valid marriage, Fereshteh's belief she had celebrated a valid Muta marriage initially might seem sufficient to come within the doctrine. However, our overview discloses the doctrine requires a belief a marriage is lawful within the meaning of the Civil Code.

■ Assuming the trial court based its finding of putative marriage on Fereshteh's belief she had conducted a valid Muta marriage, the ruling was error.[7]

### 4. *Remaining contentions not reached.*

Speros also contends the trial court's ruling resurrects common law marriage, contravening public policy, and invites our comment. He further

---

[6] Black's Law Dictionary (5th ed. 1979) at page 1390 defines "valid" inter alia as: "Having legal strength or force, executed with proper formalities, . . . Of binding force; legally sufficient or efficacious; . . ."

[7] Moreover, the putative marriage doctrine operates to protect expectations in property acquired through joint efforts. (*Schneider* v. *Schneider, supra,* 183 Cal. at pp. 339-340.) Where, as here, there is neither cohabitation, pooling of earnings, acquisition of jointly owned property, nor any economic interdependence, the rationale of section 4452 would not be served.

complains it was error for the trial court to qualify Fereshteh as an expert in Islamic custom and practice and the Muta marriage.

However, in view of our extensive treatment of the main issue here, it is unnecessary specifically to address these contentions.

## CONCLUSION

The fact that the purported marriage was neither void nor voidable is without import, as section 4452 merely requires a threshold determination a marriage is legally infirm.

Under the putative marriage doctrine, the requisite good faith belief must have a reasonable basis, as a sincere but objectively unreasonable belief is not in good faith. Further, the belief must be in a lawful marriage. A belief one's marriage conforms to the precepts of one's faith is insufficient to come within the doctrine.

Fereshteh's belief she conducted a valid Muta marriage ceremony is not what is contemplated by section 4452. Even assuming Fereshteh believed she was validly married under California law, because her belief is objectively unreasonable, the requisite good faith is lacking.

## DISPOSITION

Let a peremptory writ of mandate issue, directing the trial court to vacate its judgment on bifurcated issues and to make a different order consistent with this opinion. Speros to recover costs on appeal.

Croskey, J., concurred.

Danielson, J., concurred in the result only.