**In re the Marriage of CHOA YANG XIONG, petitioner, Respondent,**

v.

**SU XIONG, Appellant.**

**No. A10–1525.**

Court of Appeals of Minnesota.

June 6, 2011.

Jonathan Geffen, Arneson & Geffen PLLC, Minneapolis, MN; and Sia Lo, Lo Law Firm, Woodbury, MN, for respondent.

Lawrence H. Crosby, Jay D. Olson, Crosby & Associates, St. Paul, MN, for appellant.

Considered and decided by SCHELLHAS, Presiding Judge; KLAPHAKE, Judge; and SHUMAKER, Judge.

## OPINION

SCHELLHAS, Judge.

Appellant argues that the district court clearly erred by finding that respondent was his putative spouse. Because the record contains evidence of respondent's good-faith belief that she was legally married to appellant, we affirm.

## FACTS

On December 8, 2009, respondent Choa Yang Xiong (Yang)[1] commenced this ac-

---

1. Yang is respondent's family name; she took    appellant's name, Xiong, when she started her

tion against appellant Su Xiong (Xiong), seeking determinations of custody, parenting time, child support, spousal maintenance, and division of property on the theory that she was Xiong's putative spouse. Xiong denied that Yang was his putative spouse, and a family-court referee held a trial on the issue.

Based on testimony at the trial, Yang came to the United States of America from a refugee camp in Laos in 1988 when she was about 16 years old. At the refugee camp, Yang learned basic things to prepare her for life in the United States, but she did not learn to speak English. When Yang arrived in the United States, she spoke no English. By 1992, when Yang graduated from high school, she could read only "the easy basic words" in English and could speak "a little"—her high school classes, although taught in English, taught only "basic" things such as numbers, the alphabet, "what tables were, what's a chair[,] [t]he different fruits like apples and oranges, things like that." Yang passed the test required for graduation, but at the time of trial, she could read English only "a little bit, only the easy things." Yang's brothers, who testified at the hearing, confirmed that Yang could not speak any English when she came to the United States. One brother testified that at the time of the hearing, Yang could read and write English at about a sixth- or seventh-grade level and had trouble with difficult words.

Yang met Xiong while she was still in high school. Two weeks after meeting Xiong, in January 1989, the couple had a Hmong cultural marriage ceremony. Each of their families provided a *Mej Koob,* who "negotiate[ed] regarding the meal, the wedding, and how much the dowry [would] be." The wedding included a ceremony, a meal, and Xiong's payment of a $2,400 dowry. Following the ceremony, the *Mej Koob* named Xiong and Yang husband and wife and, according to Yang, that was "the end of it." Yang testified that her Hmong wedding was the same as other Hmong cultural weddings that she has attended. Consistent with Yang's testimony, her brothers testified that Xiong and Yang had a Hmong cultural wedding that included *Mej Koob* and the payment of a dowry.

After their Hmong wedding, the couple began residing together but did not legalize their marriage because Yang was not of legal marrying age. In the Hmong community, the couple described themselves as husband and wife. Xiong's family referred to Yang as "Mrs. Su" because they thought of her as Xiong's wife. But outside the community they described themselves as boyfriend and girlfriend.

Xiong and Yang's families decided that as soon as Yang turned 18, the couple should get a "marriage license." The leader of the Xiong clan testified that he advises clan members that if they get a marriage license, they are legally married in Minnesota. One of Yang's brothers, the leader of the Yang clan, testified that in the 1990s, he told Yang that "she needed to go through a legal marriage ceremony and get a marriage certificate," which he believed included testifying in court. He testified that he understood the difference between a marriage license and a marriage certificate. But Yang testified that in the Hmong language they do not distinguish between the two, that her brother "said something about getting a marriage paper," and that she needed a "marriage paper."

On December 4, 1993, the couple obtained a marriage license from Ramsey County. The license stated:

naturalization petition.

To any person lawfully authorized to solemnize marriages within the State of Minnesota: License is hereby granted to join in marriage, within six months from the date hereof, Su Xiong . . . and Choa Yang[.] Wherefore, this shall be your authority for solemnizing the marriage of said parties, and making return thereof within five days as provided by law. Yang recalled that after Xiong completed the paperwork, Yang and Xiong gave their driver's licenses to a woman who told them to raise their right hands and sign something. The woman then handed them the marriage license. Afterwards Xiong told Yang that they "were officially married, all the paperwork was done. And he said we were married culturally and legally, so everything was done. He handed me a paper in an envelope and that was the end of it." Yang did not read the license because she did not have sufficient reading skills to understand it, but she knew it was a marriage license. She "glanced at it with the big writing [that] says marriage license and then [her] name and his name, and [she] just put it in a safe place with [her] important papers." Yang told her father and brothers that she and Xiong were legally married.

When asked whether she went to court and testified as her brother told her to do, Yang answered that she testified at "City Hall"; her understanding was that when the clerk asked her to raise her hand, she was testifying. Yang believed that she and Xiong exchanged vows when they raised their hands and said "yes." Yang testified that she does not know the difference between City Hall and court.

After obtaining the marriage license, Yang referred to Xiong as her husband outside the Hmong community, and she always heard Xiong refer to her as his wife. She never again referred to Xiong as her boyfriend, and she never again heard Xiong refer to her as his girlfriend. Yang's brothers also always heard Yang refer to Xiong as her husband and never heard Xiong refer to Yang as his girlfriend.

Xiong, who had worked as a professional tax preparer, filed joint income-tax returns for the couple. Yang testified that on all legal documents, the couple indicated that they were married and that she was not aware of any document that indicated that they were not married. When Yang applied for naturalization, she reported to the Immigration and Naturalization Service (I.N.S.) that she was married. She also recalled that she brought her marriage license with her to her naturalization interview, as requested, and no one told her that the document was not evidence of marriage. In fact, Yang's certificate of naturalization, dated November 20, 1996, reflects that she is married. Xiong and Yang also bought a house and insurance together as a married couple.

Yang first began to worry that she might not be legally married to Xiong in 2006, when Xiong brought home a second wife. Yang told Xiong that in American culture, he could not have more than one wife. The couple argued, and Xiong told Yang that she was "not even his wife." After the argument, Xiong told Yang that he only made the statement out of anger, did not mean anything by it, and that they were married culturally and legally. Yang believed him. One of Yang's brothers testified that Yang never came to him with any doubts about the legality of her marriage.

In May 2008, Yang contacted a lawyer in anticipation of divorcing Xiong. She had some concerns that they may not be legally married based on the statement Xiong made to her in 2006. The lawyer discovered that although the couple had obtained a marriage license in 1993, it was not re-

turned and no marriage certificate existed. Through an interpreter, the lawyer explained to Yang that she was not legally married in the United States. The lawyer testified that Yang became "very upset" and cried. The lawyer had to repeatedly tell her that she was not legally married. Yang testified that:

> [W]hen I heard the news I fe[lt] very sorry for myself. I wonder[ed] to myself why would my husband mislead me[?] ... I have a whole bunch of children and it seems like he buried all of us alive.... It made me think—because I thought I knew my husband, but when that came about I realized that I didn't know him, I didn't know my husband. It made me, you know, again feel sorry for myself and [I] was overwhelmed with it.

After meeting with the lawyer, Yang tried to talk to Xiong about whether they were legally married, but he said that an "ignorant person like [you] doesn't know anything."

Yang testified that she did not know how to get legally married in Minnesota until sometime after November 3, 2009, when she asked a friend to explain it to her. During cross-examination of Yang, Xiong's lawyer asked her to explain how she could have a good-faith belief that she and Xiong were married if she did not know how to get married. Yang answered, "Because [Xiong] was my husband and he took me to get our marriage license, ... he spoke English and he was a smart guy. So of course he was my husband and he told me that we were married and of course I would believe him."

Xiong testified at the trial and contradicted almost every point of Yang's testimony. Xiong testified that: Yang spoke English when she came to the United States; Yang could read and write English during high school; Yang was in advanced classes in high school with "American students"; Yang passed "very hard tests" in order to get her diploma; he and Yang were never culturally married because no one documented the gifts and donations; the party was merely to celebrate that they would be living together; the *Mej Koobs* at the party "just came to help" and did not marry them; he did not pay a dowry to Yang's family; when he and Yang got the marriage license, an official gave Yang a list of judges to contact to perform the ceremony; Yang was dating other men throughout their relationship and did not want to get legally married because she wanted to continue to date; he never referred to Yang as his wife; he referred to her only as his girlfriend; he never heard Yang refer to him as her husband; he filed joint income tax returns only to save money and he and Yang knew that it was wrong; and Yang "forced" him to sign a life-insurance application that he never read and "lots of" other documents indicating they were married.

Following the trial, the district court "unequivocally f[ound] that [Yang's] testimony in her belief that she was legally married to [Xiong] was credible," and "unequivocally [found] that [Xiong's] testimony as to his belief that [Yang] knew, or had reason to know, that the parties were not married [wa]s not credible." The court also found that the parties owned a home together, lived together, had children together, filed joint tax returns, and "came to the Ramsey County Courthouse and obtained a marriage license wherein both parties raised their hand, leading [Yang] to conclude, for that and other reasons testified to, that they were legally married."

Based on the evidence adduced at the evidentiary hearing, the district court found that Yang was "a putative spouse who acquired the rights conferred upon

[Xiong's] legal spouse until [Yang] had knowledge of the fact that she was not legally married to [Xiong]" under Minn. Stat. § 518.055 (2010). This appeal follows.

## ISSUE

Did the district court clearly err by finding Yang to be Xiong's putative spouse?

## ANALYSIS

■ Xiong argues that the district court clearly erred by finding that Yang was his putative spouse. Whether a person is a putative spouse is a question of fact. *See Mjolsness v. Mjolsness*, 363 N.W.2d 839, 841 (Minn.App.1985) (treating district court's decision that party was not a putative spouse as finding of fact). This court will not disturb the district court's finding as to putative-spouse status unless, upon review of the record, it "is left with a definite and firm conviction that a mistake has been made." *Id.*

■ Minnesota's putative-spouse law provides:

> Any person who has cohabited with another to whom the person is not legally married in the good faith belief that the person was married to the other is a putative spouse until knowledge of the fact that the person is not legally married terminates the status and prevents acquisition of further rights. A putative spouse acquires the rights conferred upon a legal spouse, including the right to maintenance following termination of the status. . . .

Minn.Stat. § 518.055. The district court's finding that Yang had a good-faith belief that she was legally married to Xiong is supported by the ample record evidence already described. Although Xiong's testimony contradicted Yang's testimony, the district court discredited Xiong's testimony and credited Yang's. We defer to the district court's assessment of the credibility of witnesses. *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn.1988). The evidence is sufficient to support the district court's findings that Yang had a good-faith belief that she was legally married to Xiong and was his putative spouse.

Xiong argues that the putative-spouse doctrine should be applied only when the parties have participated in a wedding ceremony. His argument is flawed for two reasons. First, the argument has no support in the plain language of Minnesota's putative-spouse law, which requires only that (1) the parties cohabit, (2) the parties are not legally married, and (3) the person seeking putative-spouse status have a good-faith belief that the parties were legally married. *See* Minn.Stat. § 518.055. Second, Yang testified that she believed that the parties were exchanging their wedding vows before the clerk at "City Hall" when they were asked to raise their hands and say "yes," and the district court expressly credited Yang's testimony. Therefore, even if a ceremony were required, Yang had a good-faith belief that a wedding ceremony occurred.

Xiong next argues that Minnesota should apply an objective standard to a putative-spouse claimant's good-faith belief that he or she was legally married. In support of this assertion, Xiong cites to a California case in which the court held that for purposes of California's putative-spouse law, "good faith is tested by an objective standard." *See In re Marriage of Vryonis*, 202 Cal.App.3d 712, 248 Cal. Rptr. 807, 812–13 (1988). Based on California caselaw, the court read a reasonableness requirement into the putative-spouse statute. *Id.* We reject Xiong's argument because in Minnesota, "good faith" is judged subjectively, while "reasonable belief" is judged objectively. *Bahr v. Capella Univ.*, 788 N.W.2d 76, 82 (Minn.

2010).  The plain language of section 518.055 requires only a "good faith belief," not a "reasonable belief."  We therefore determine that the district court correctly used a subjective analysis of Yang's good-faith belief in finding that she was Xiong's putative spouse.

## DECISION

Based on ample evidence in the record that Yang had a good-faith belief that she and Xiong were legally married, the district court did not clearly err by finding Yang to be Xiong's putative spouse, and we affirm.

**Affirmed.**