Filed 6/20/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| NANCY CEJA, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S193493 |
| v. | ) | |
| | ) | Ct.App. 6 H034826 |
| RUDOLPH & SLETTEN, INC., | ) | |
| | ) | Santa Clara County |
| Defendant and Respondent. | ) | Super. Ct. Nos. CV112520 & |
| | ) | CV115283 |
| _____ | ) | |

Section 377.60 of the Code of Civil Procedure[1] provides that a wrongful death action may be brought by a decedent's "putative spouse" if he or she was dependent on the decedent. (§ 377.60, subd. (b).) The statute defines a putative spouse as "the surviving spouse of a void or voidable marriage who is found by the court to have *believed in good faith* that the marriage to the decedent was valid." (*Ibid*. [italics added].) In question here is the meaning of the phrase in italics. Is the good faith inquiry a purely subjective one, or does the inquiry also require application of an objective test?

We conclude section 377.60 contemplates a subjective standard that focuses on the alleged putative spouse's state of mind to determine whether he or she maintained a genuine and honest belief in the validity of the marriage. Good

---

[1] All further statutory references are to this code unless otherwise specified.

faith must be judged on a case-by-case basis in light of all the relevant facts, such as the efforts made to create a valid marriage, the alleged putative spouse's background and experience, and the circumstances surrounding the marriage, including any objective evidence of the marriage's invalidity. Under this standard, the reasonableness of the claimed belief is a factor properly considered along with all other circumstances in assessing the genuineness of that belief. The good faith inquiry, however, does not call for application of a reasonable person test, and a belief in the validity of a marriage need not be objectively reasonable.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 19, 2007, Robert Ceja (decedent) was killed in an accident at a construction site. Nancy Ceja (plaintiff) filed this wrongful death action against Rudolph & Sletten, Inc. (defendant), claiming she was the putative spouse of decedent. (§ 377.60, subd. (b).) Defendant filed an answer alleging multiple affirmative defenses, including one challenging plaintiff's standing to bring this action as a putative spouse. The parties engaged in discovery, which produced the following evidence.

Decedent and Christina Ceja[2] were wed in 1995. When decedent met plaintiff in 1999, he told plaintiff he was married but separated. In 2001, decedent filed a petition for dissolution of his marriage to Christina, and he started living with plaintiff.

In September 2003, plaintiff and decedent filled out a license and certificate of marriage. The completed document was marked "0" in the space for listing decedent's "number of previous marriages" and was left blank in two other spaces asking how and when any previous marriage had been terminated. Despite

---

[2]     Christina Ceja shares the same surname as plaintiff and decedent. We refer to her as Christina for clarity and brevity and intend no disrespect.

2

knowing of decedent's marriage to Christina, plaintiff signed the "Affidavit" box in the document indicating its contents were "correct and true to the best of our knowledge and belief." A license to marry was issued to plaintiff and decedent on September 24, 2003.

It turns out decedent was still married to Christina when he and plaintiff held their wedding ceremony three days later, on September 27, 2003. On December 31, 2003, the Santa Clara County Superior Court filed a "Notice of Entry of Judgment" and mailed it to the home of plaintiff and decedent. The notice stated that a judgment for dissolution of the marriage between decedent and Christina had been entered on December 26, 2003, and that the judgment was effective as of the date the judgment was filed. The notice also contained a statement — which appeared in a separate box and was printed in bold type — warning that "[n]either party may remarry until the effective date of the termination of marital status." In January 2004, plaintiff faxed a copy of this court document to decedent's ironworkers union so she could be added to decedent's medical insurance. Decedent's fatal accident occurred over three years later.

As relevant here, defendant moved for summary judgment, contending plaintiff lacked standing to sue for wrongful death as a putative spouse because she did not have the requisite "good faith belief" that her marriage to decedent was valid. Defendant's motion was based on the following undisputed material facts: (1) plaintiff and decedent were married before the dissolution of his marriage to Christina became final, rendering decedent's marriage to plaintiff bigamous and void; (2) although plaintiff knew of decedent's previous marriage, she signed a marriage license in which decedent falsely represented he had not been married before; and (3) the court document plaintiff faxed to decedent's union clearly indicated his marriage to Christina was not dissolved until after his wedding with plaintiff.

3

In opposing the motion, plaintiff argued there were triable issues of material fact regarding her status as a putative spouse. She submitted a declaration claiming, among other things, that she understood decedent had filed for "divorce" in 2001,[3] but that she did not know what happened after that because decedent would never discuss the subject. Plaintiff "did not read the marriage certificate in any detail and simply signed the document." She recalled having subsequently faxed a copy of the final divorce papers to the ironworkers union to confirm decedent's final dissolution of marriage, but she "[did] not recall looking specifically at the papers before sending them." Although plaintiff was "unclear on the specific date" of the dissolution, she "absolutely knew" decedent was "divorced from Christina" at the time she faxed the court document and at the time of his accident. Following their well-attended marriage ceremony, plaintiff held herself out as decedent's wife "to all persons at all times." She changed her last name to Ceja, and the two of them wore wedding rings, shared a joint checking account, lived together in the same house as husband and wife, and handled their taxes as married but filing separately. Plaintiff would not have had her wedding on September 27, 2003, had she not believed she would have a legal and valid marriage to decedent. Had she realized at any time that her marriage was invalid, she and decedent "would have simply redone the ceremony."

The trial court granted defendant's motion for summary judgment. Consistent with *In re Marriage of Vryonis* (1988) 202 Cal.App.3d 712 (*Vryonis*),

---

[3] In 1969, the Family Law Act (Stats. 1969, ch. 1608, § 8, pp. 3314-3344) changed a number of long-established designations of family law actions, substituting, among other things, "dissolution of marriage" for "divorce." (See 11 Witkin, Summary of Cal. Law (10th ed. 2005) Husband and Wife, § 1.) Herein, we will use the term "divorce" when necessary to reflect the use of that term in the record and when discussing opinions predating the change in designation.

4

the court applied an objective test for putative spouse status and found the undisputed material facts established that plaintiff did not have an objectively reasonable good faith belief in the validity of her marriage to decedent.

The Court of Appeal reversed. Disagreeing with *Vryonis*'s objective approach, the court held section 377.60's requirement of a good faith belief refers to the alleged putative spouse's subjective state of mind. In the court's view, plaintiff's claims that she believed and acted as if her marriage were valid and that she had not read the marriage license or the final divorce papers, if found credible by the trial court, could support a finding of a good faith belief and establish putative spouse status.

We granted defendant's petition for review.

### DISCUSSION

In California, wrongful death actions are statutory in origin and exist " 'only so far and in favor of such person as the legislative power may declare.' " (*Justus v. Atchison* (1977) 19 Cal.3d 564, 575.) Under the current statute, those who may sue for a person's wrongful death are limited to the decedent's spouse, domestic partner, children, and other enumerated heirs (§ 377.60, subd. (a)), the decedent's dependent putative spouse, children of the putative spouse, stepchildren, and parents (*id*., subd. (b)), and the decedent's minor dependents in certain circumstances (*id*., subd. (c)). The purpose of this standing requirement " 'is to enable the heirs and certain specified dependents of a person wrongfully killed to recover compensation for the economic loss and deprivation of consortium they suffer as a result of the death.' " (*People v. Giordano* (2007) 42 Cal.4th 644, 658 [italics omitted].) A trial court's finding regarding putative spouse status will be upheld on appeal if supported by substantial evidence. (*Vallera v. Vallera* (1943) 21 Cal.2d 681, 684; *Estate of Goldberg* (1962) 203 Cal.App.2d 402, 412 (*Goldberg*).)

5

We must decide whether section 377.60, subdivision (b) (section 377.60(b)) contemplates a subjective or objective standard of good faith for putative spouse status. Because this presents a question of statutory construction, we review the matter de novo. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.)

When construing a statute, our objective "is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." (*Estate of Griswold* (2001) 25 Cal.4th 904, 910.) We look first to the words of the statute, " ' "because they generally provide the most reliable indicator of legislative intent." [Citation.] We give the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].' (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529-530.) ' "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citation.] "Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation." ' " (*In re Ethan C.* (2012) 54 Cal.4th 610, 627.)

Section 377.60(b) defines "putative spouse" to mean "the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid." The dispute here centers on the meaning of the statutory phrase "believed in good faith."

Plaintiff, like the Court of Appeal below, construes the phrase as referring solely to subjective good faith, i.e., the court need only find the alleged putative spouse held an honest, genuine, and sincere belief in the validity of the marriage. Defendant, like the trial court, asserts the party's belief must also be objectively reasonable. For the reasons below, we conclude that the good faith inquiry is purely subjective and evaluates the state of mind of the alleged putative spouse, and that the reasonableness of the claimed belief is properly considered as part of

6

the totality of the circumstances in determining whether the belief was genuinely and honestly held.

### A. The Subjective Nature of the Good Faith Inquiry

In ordinary usage, the phrase "good faith" is commonly understood as referring to a subjective state of mind. (See *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 106, fn. 3.) Lay dictionaries, for example, equate good faith with "sincerity" and "honesty." (Webster's 3d New Internat. Dict. (2002) p. 978, col. 3 ["a state of mind indicating honesty and lawfulness of purpose" or "absence of fraud, deceit, collusion, or gross negligence"]; Random House Webster's College Dict. (2001) p. 565, col. 2 ["accordance with standards of honesty, trust, sincerity, etc."]; 5 Oxford English Dict. (2d ed. 1989) p. 679, col. 1 ["honesty of intention in entering into engagements, sincerity in professions"].) In *People v. Nunn* (1956) 46 Cal.2d 460, 468, our court explained that good faith is "ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." (See *Efron v. Kalmanovitz* (1967) 249 Cal.App.2d 187, 192.)

There appears nothing about a purely subjective standard that renders section 377.60 illogical or unworkable in operation. Depending on the context, however, good faith may also describe an objective standard requiring a reasonable basis, or alternatively, a standard combining both subjective and objective components. (See *Cotran v. Rollins Hudig Hall Internat., Inc.*, *supra*, 17 Cal.4th at p. 106, fn. 3; e.g., *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 805-806 [statute precluding payment penalties in good faith contractor disputes]; *Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing* (2004) 119 Cal.App.4th 1038, 1054 [U. Com. Code's good faith requirement]; *City of*

*Oakland v. Workers' Comp. Appeals Bd.* (2002) 99 Cal.App.4th 261, 267 [" 'good faith personnel action' " exemption in statute governing psychiatric injury claims].)

Here, the appropriate context for understanding the phrase as it appears in section 377.60(b) is furnished by the judicially developed putative spouse doctrine. As both parties acknowledge, the wrongful death statute did not include an explicit provision for putative spouses until 1975.[4] (Former § 377, as amended by Stats. 1975, ch. 334, § 1, p. 784; see Stats. 1975, ch. 1241, § 5.5, p. 3189.) But long before any California statute first made reference to putative spouses, our courts began developing the putative spouse concept as a means for enabling a party to an invalid marriage to enjoy certain of the civil benefits of marriage if he or she believed in good faith that the marriage was valid. (E.g., *Figoni v. Figoni* (1931) 211 Cal. 354, 356-357; *Schneider v. Schneider* (1920) 183 Cal. 335, 337-341; *Coats v. Coats* (1911) 160 Cal. 671, 675; *Kunakoff v. Woods* (1958) 166 Cal.App.2d 59, 63-68 [wrongful death].)

When the predecessor to section 377.60 was amended in 1975 to include putative spouses, the Legislature used language nearly identical to the language adopted in 1969 as part of the former Family Law Act.[5] (Compare Code Civ.

---

[4] California's first wrongful death statute was enacted in 1862. (See *Rosales v. Battle* (2003) 113 Cal.App.4th 1178, 1182.) " 'In 1872, the statute was codified as former section 377 of the Code of Civil Procedure.' " (*Rosales*, at p. 1182.) In 1992, the Legislature repealed former section 377 and reenacted its contents in section 377.60 without substantive change. (Stats. 1992, ch. 178, § 20, p. 890; see *Rosales*, at p. 1182.)

[5] The putative spouse doctrine was first codified in 1969, in former section 4452 of the Civil Code, as part of the former Family Law Act (Civ. Code, former § 4400 et seq.). Former section 4452 addressed the distribution of quasi-marital property upon death or dissolution and defined putative spouses in language

*(footnote continued on next page)*

8

Proc., former § 377 with Civ. Code, former § 4452, added by Stats. 1969, ch. 1608, § 8, pp. 3314, 3322.) Because codification of the putative spouse doctrine was not meant to restrict the doctrine's application (*Vryonis*, *supra*, 202 Cal.App.3d at p. 719; *In re Marriage of Monti* (1982) 135 Cal.App.3d 50, 54-55), precodification case law provides the key to ascertaining the Legislature's intent.

Under precodification case law, the good faith inquiry focused exclusively on the state of mind of the alleged putative spouse. The subjective nature of the inquiry was demonstrated by (1) the judicially recognized purpose of the putative spouse doctrine; (2) the types of factors deemed relevant to the inquiry; and (3) judicial review of postmarriage conduct. We address these matters in turn.

Our court made clear from the beginning that the fundamental purpose of the putative spouse doctrine was to protect the expectations of innocent parties and to achieve results that are equitable, fair, and just. (E.g., *Schneider v. Schneider*, *supra*, 183 Cal. at pp. 339-342; *Coats v. Coats*, *supra*, 160 Cal. at pp. 676-679; see *Pack v. Vartanian* (1965) 232 Cal.App.2d 466, 475; accord, *In re Marriage of Guo*

---

*(footnote continued from previous page)*

conforming to the case law: "Whenever a determination is made that a marriage is void or voidable and the court finds that either party or both parties believed in good faith that the marriage was valid, the court shall declare such party or parties to have the status of a putative spouse . . . ." (Former § 4452, added by Stats. 1969, ch. 1608, § 8, pp. 3314, 3322.) In 1992, the Legislature repealed the Family Law Act and enacted the Family Code. The putative spouse provisions of the repealed statute are now codified at Family Code section 2251. (See Stats. 1992, ch. 162, § 10, p. 463; 1994 Family Code (Nov. 1993) 23 Cal. Law Revision Com. Rep. 1 (1993).)

Other statutes codifying the putative spouse doctrine now include Code of Civil Procedure section 872.210 (partition actions) and Family Code sections 17505 and 17506 (enforcement of child support orders and parental location). (See generally *Estate of Sax* (1989) 214 Cal.App.3d 1300, 1305 [describing applicability of putative spouse doctrine in additional statutory contexts].)

*& Sun* (2010) 186 Cal.App.4th 1491, 1496.)  To effectuate this purpose, courts applied the doctrine only when the alleged putative spouse's belief in the validity of a marriage was found to have been "genuine" (*Vallera v. Vallera*, *supra*, 21 Cal.2d at p. 684), "bona fide" (*Flanagan v. Capital Nat. Bank* (1931) 213 Cal. 664, 666 (*Flanagan*) [italics omitted]), or "honestly" held (*Sutton v. Sutton* (1956) 145 Cal.App.2d 730, 733; *Turknette v. Turknette* (1950) 100 Cal.App.2d 271, 274).  By recognizing putative spouse status in cases of genuine, bona fide, or honestly held beliefs, courts adhered to the commonly understood meaning of good faith, i.e., a state of mind denoting honesty of purpose and freedom from intention to defraud.  (Webster's 3d New Internat. Dict., *supra*, p. 978, col. 3; Random House Webster's College Dict., *supra*, p. 565, col. 2; 5 Oxford English Dict., *supra*, p. 679, col. 1.)

In evaluating a party's state of mind,[6] courts considered whether efforts were made to create a valid marriage and whether the party was ignorant of the infirmity rendering the marriage void or voidable.  (*Estate of Krone* (1948) 83 Cal.App.2d 766, 768; see *Vallera v. Vallera*, *supra*, 21 Cal.2d at p. 684; *Flanagan*, *supra*, 213 Cal. at p. 667.)  Good faith was a question of fact that depended on all the circumstances leading up to and surrounding the invalid marriage, and a party's state of mind when entering the marriage was key.  (*Goldberg*, *supra*, 203 Cal.App.2d at p. 412; e.g., *Brown v. Brown* (1969) 274 Cal.App.2d 178, 186-187; *Sancha v. Arnold* (1952) 114 Cal.App.2d 772, 778; *Estate of Foy* (1952) 109 Cal.App.2d 329, 331-332.)  However, a party who married in good faith could lose putative spouse status as of the date the marriage's infirmity was discovered.  (See *Gallaher v. State Teachers' Retirement System* (1965) 237 Cal.App.2d 510, 520;

---

[6]     When addressing the state of the mind of a "party," we refer to the alleged putative spouse, who may be someone other than the party litigant.

e.g., *Estate of Raynor* (1958) 165 Cal.App.2d 715, 722-723; *Lazzarevich v. Lazzarevich* (1948) 88 Cal.App.2d 708, 718-719.)

Courts assessed a party's efforts to create a valid marriage by looking to the extent of compliance with the legal requisites of a marriage. In determining what inference to draw from a party's efforts or lack thereof, courts deemed it appropriate to consider the party's personal circumstances. For example, lack of personal familiarity and experience with marriage could support a good faith claim where the marriage was not solemnized. (E.g., *Temescal Rock Co. v. Industrial Acc. Com.* (1919) 180 Cal. 637; *Santos v. Santos* (1939) 32 Cal.App.2d 62 [parties did not solemnize marriage because they thought obtaining a license was sufficient]; *Macchi v. La Rocca* (1921) 54 Cal.App. 98 [same].) Conversely, the circumstance that a plaintiff "lived all her life in California, and had been previously legally married and divorced," was found to undermine a good faith claim where personal vows were exchanged but "[n]o license was procured and no solemnization was had." (*Flanagan*, *supra*, 213 Cal. at pp. 666-667.)

Other factors personal to a party, such as age and educational background, also appeared relevant to the good faith inquiry. (E.g., *Kunakoff v. Woods*, *supra*, 166 Cal.App.2d at p. 61 & fn. 1 [although parties stipulated to plaintiff's putative wife status, court noted she "went to grammar school until she was 14" and was 18 years old when she attempted to marry in a Molokan religious ceremony]; *Neureither v. Workmen's Comp. App. Bd.* (1971) 15 Cal.App.3d 429, 434-435 [where petitioner had seventh-grade education but secured annulment in Cal. of previous marriage, referee erred in holding her accountable for knowledge of Mich. law].)

Where, as here, a bigamous marriage was involved, the relevant circumstances included the party's personal marital experiences, as well as what the party knew or was told regarding the prior marriage and its supposed

11

termination. In this regard, prior marriage and divorce experience was not a per se bar to a good faith finding. (E.g., *Brennfleck v. Workmen's Comp. Appeals Bd.* (1968) 265 Cal.App.2d 738, 744-745; *Goldberg*, *supra*, 203 Cal.App.2d at pp. 408-412.) Such experience, however, could either support or undercut a good faith claim, depending on the totality of the circumstances. Good faith could be found if the bigamist, or someone else claiming authoritative factual or legal knowledge, told the prospective spouse that a remarriage could occur because the prior marriage had been legally terminated. (E.g., *Brown v. Brown*, *supra*, 274 Cal.App.2d at p. 186; *Brennfleck*, at pp. 744-745; *Goldberg*, at p. 412; *Estate of Foy*, *supra*, 109 Cal.App.2d at p. 331.) On the other hand, good faith claims were rejected where a bigamist told his bride he was not divorced from his wife (*Oakley v. Oakley* (1947) 82 Cal.App.2d 188, 190-191) and where a party was so "thoroughly familiar" with divorce and marriage procedures that she could not have been ignorant of "the farcical solemnization" of her own second divorce or the bogus nature of her attempted third marriage (*Miller v. Johnson* (1963) 214 Cal.App.2d 123, 125-126). That courts examined the totality of the circumstances from the personal perspective of the alleged putative spouse supports the inference of a subjective good faith standard.

Finally, precodification decisions typically evaluated whether the parties to an alleged putative marriage acted as if they were married. While the belief a party held when entering the marriage was determinative (*Goldberg*, *supra*, 203 Cal.App.2d at p. 412), postmarriage conduct was viewed as shedding light on the genuineness of that subjective belief. The following types of conduct generally supported a finding of good faith: The parties went through a marriage ceremony

and thereafter resided together as a married couple.[7]  The parties started a family together or had children from a previous relationship living with them or adopted.[8]  The parties held themselves out to the public as married.[9]  The parties handled some or all of their finances, earnings, property, and income taxes in a joint manner.[10]

When a party was found credible in asserting a genuine belief in the validity of a marriage, the objective reasonableness of that belief generally was left unaddressed.  For instance, in *Coats v. Coats*, *supra*, 160 Cal. 671, the trial court ordered an annulment of marriage and a division of property upon finding the plaintiff had entered into a marriage "in the full belief in good faith that she was physically capable of marrying and she continued in good faith in said belief for more than eighteen years thereafter," up to the date the defendant sought an annulment based on her physical incapacity.  (*Id*. at p. 673.)  With regard to the good faith finding, our court was not persuaded that the plaintiff "could not have been in ignorance of the fact of her physical incapacity for eighteen years."  (*Id*. at

[7]      (E.g., *Feig v. Bank of America National Trust and Savings Association* (1936) 5 Cal.2d 266, 269-270 (*Feig*); *Brown v. Brown*, *supra*, 274 Cal.App.2d at pp. 186-187; *Goldberg*, *supra*, 203 Cal.App.2d at p. 412; *Estate of Foy*, *supra*, 109 Cal.App.2d at p. 331; *Turknette v. Turknette*, *supra*, 100 Cal.App.2d at pp. 279-280.)

[8]      (E.g., *Turknette v. Turknette*, *supra*, 100 Cal.App.2d at pp. 279-280; *Brown v. Brown*, *supra*, 274 Cal.App.2d at p. 186.)

[9]      (E.g., *Goldberg*, *supra*, 203 Cal.App.2d at pp. 405-406, 412; *Krizman v. Industrial Acc. Com.* (1936) 14 Cal.App.2d 419, 420-422.)

[10]      (E.g., *Brown v. Brown*, *supra*, 27 Cal.App.2d at pp. 186-187; *Goldberg*, *supra*, 203 Cal.App.2d at pp. 405-406, 412; *Partrick v. Partrick* (1952) 112 Cal.App.2d 107, 108-111; *Turknette v. Turknette*, *supra*, 100 Cal.App.2d at pp. 279-280; *Krizman v. Industrial Acc. Com.*, *supra*, 14 Cal.App.2d at pp. 420-422.)

p. 679.)  Instead, we held that "any inquiry in this respect is foreclosed by the court's [credibility] finding, which is not open to attack on this appeal."  (*Ibid.*; see also *Feig*, *supra*, 5 Cal.2d at p. 270 [although evidence appeared " 'strange and out of the ordinary,' " its weight was addressed to the trial court].)

### B.  The Relevance of Reasonableness

*Vryonis*, *supra*, 202 Cal.App.3d 712, decided after the Legislature codified the putative spouse doctrine, was the first California case to hold that a party seeking putative spouse status must demonstrate an objectively reasonable belief in a marriage's validity.  In *Vryonis*, the trial court made the following findings.  An Iranian citizen (Fereshteh) performed a private ceremony in which she married a college teacher (Speros).  The ceremony conformed to the requirements of a "Muta" marriage authorized by the Moslem sect of which she was an adherent.  Fereshteh had no knowledge of the requirements of California marriage law, and the private ceremony did not create a valid California marriage.  Fereshteh, however, justifiably relied on Speros's assurances that they were husband and wife.  (*Vryonis*, at pp. 715-716.)  Based on these findings, the trial court held Fereshteh had a good faith belief in the marriage's validity and ruled she was entitled to rights as a putative spouse.  (*Id*. at p. 716.)

The Court of Appeal reversed.  In overturning the good faith determination, the court found it significant that "the alleged private marriage went unsolemnized, unlicensed and unrecorded" and that "the parties did not cohabit, or hold themselves out as husband and wife, and in no way approximated the conduct of a married couple."  (*Vryonis*, *supra*, 202 Cal.App.3d at p. 722.)[11]  *Vryonis* held:

---

[11]     The court described the couple's post-marriage conduct as follows.  "[T]he parties did not reside together, but continued to maintain separate households.  They did not assume any support obligations for one another.  They spent no more

*(footnote continued on next page)*

14

"A proper assertion of putative spouse status must rest on facts that would cause a reasonable person to harbor a good faith belief in the existence of a valid marriage. Where there has been no attempted compliance with the procedural requirements of a valid marriage, and where the usual indicia of marriage and conduct consistent with a valid marriage are absent, a belief in the existence of a valid marriage, although sincerely held, would be unreasonable and therefore lacking in good faith." (*Vryonis*, *supra*, 202 Cal.App.3d at p. 721.)

Since *Vryonis* was decided, the Courts of Appeal have been unanimous in holding the good faith inquiry is objective in nature. (E.g., *In re Marriage of Guo & Sun*, *supra*, 186 Cal.App.4th at p. 1497; *In re Marriage of Ramirez* (2008) 165 Cal.App.4th 751, 756; *In re Domestic Partnership of Ellis & Arriaga* (2008) 162 Cal.App.4th 1000, 1005; *Estate of DePasse* (2002) 97 Cal.App.4th 92, 107-108; *Welch v. State of California* (2000) 83 Cal.App.4th 1374, 1378; *Centinela Hospital Medical Center v. Superior Court* (1989) 215 Cal.App.3d 971, 975.) All of these decisions accepted *Vryonis*'s legal reasoning without independently analyzing the issue.

We disagree with *Vryonis* and its progeny to the extent they hold good faith is tested by an objective standard that examines whether the facts surrounding the

---

*(footnote continued from previous page)*

than five or six nights together in any given month during the marriage. Speros continued to date other women, of which fact Fereshteh was aware. Fereshteh did not use Speros's name. There was no merging of finances, nor was there any joint accumulation of real or personal property. Fereshteh and Speros filed separate tax returns, each claiming single status. For the two and one-half year period following the purported marriage, the parties did not hold themselves out as husband and wife. It was only when Speros told Fereshteh he was to be married that Fereshteh published the fact of their purported marriage." (*Vryonis*, *supra*, 202 Cal.App.3d at p. 722.)

15

marriage would cause a hypothetical reasonable person to believe in its validity, i.e., a reasonable person test. (See *Vryonis*, *supra*, 202 Cal.App.3d at p. 721.) *Vryonis* reached its conclusion in reliance on case law interpreting good faith in the context of certain criminal law principles, contractual agreements involving banks and car rental agencies, and governmental construction permits. (*Id*. at pp. 720-721.) Although an objective test has been found appropriate in those contexts, such a test is at odds with the precodification putative spouse decisions holding good faith is a factual inquiry that assesses a party's credibility and state of mind in light of all the circumstances at issue, including the party's personal background and experience. (See *ante*, pt. A.) Indeed, a reasonable person test would make it markedly more difficult to extend the civil benefits of marriage to those parties most in need of the putative spouse doctrine and its protection, namely, those innocents whose youth, inexperience, or lack of education or sophistication contributed to an honest belief in the validity of their marriages.

Even though we find section 377.60(b) does not impose a reasonable person test for gauging good faith, we nonetheless conclude the reasonableness of a party's belief is a factor properly considered along with all other relevant circumstances in determining whether the claimed belief was honest and sincere. Thus, a finding of whether a party's belief was genuinely held in good faith will be informed, in part, by whether that party was aware of facts that were inconsistent with a rational belief in the validity or lawfulness of a marriage. In this regard, a party lacking sophistication or marital experience might credibly establish a subjective good faith belief in the face of objective facts pointing to the marriage's invalidity. Conversely, a more sophisticated party in similar circumstances might have greater difficulty doing so. In short, depending on the totality of circumstances, including objective circumstances, a party's claim of subjective

16

good faith may be more likely to succeed if it was a reasonable belief, and more likely to fail if it was an unreasonable belief.

As discussed, the case law predating codification of the putative spouse doctrine did not require that belief in the validity of a marriage be objectively reasonable. The following two precodification decisions, however, touched on the topic of reasonableness in conducting the good faith inquiry.

In *Miller v. Johnson*, *supra*, 214 Cal.App.2d 123, the plaintiff claimed a putative spouse interest in the decedent's life insurance policy and a profit sharing plan. The circumstances surrounding the alleged putative marriage were as follows. The plaintiff had married her first husband in 1920 and obtained a divorce from him in 1945. She married her second husband in 1947, and they separated in 1956 without divorcing. The plaintiff claimed that on August 28, 1957, she and the decedent went to Tijuana, Mexico. In an office designated "Divorces and Marriages," they obtained a Mexican divorce decree and immediately thereafter exchanged marriage vows. The decedent also gave a wedding ring to the plaintiff. The two then returned to California and lived together until the decedent's death a few years later. (*Miller*, at p. 124.) Although the plaintiff testified she believed she was lawfully married to the decedent, the information on the Mexican divorce document in evidence was not consistent with her explanation of the events. (*Id*. at p. 126.) Given the record, *Miller* affirmed the trial court's finding that "plaintiff neither believed in good faith she was validly married to decedent nor had made any diligent attempt to meet the requisites of a valid marriage." (*Ibid*.) Acknowledging "the essential basis of a putative marriage is a belief in the existence of a valid marriage," *Miller* concluded the couple's "farcical solemnization of divorce and marriage fail[ed] to meet any tests and negate[d] good faith." (*Ibid*.)

In *Sancha v. Arnold*, *supra*, 114 Cal.App.2d 772, the trial court ruled in favor of a putative spouse claim based on the claimant's testimony that she and the decedent entered a common law marriage in Nevada, when such marriages were recognized, and that the two thereafter lived together as husband and wife in California for 24 years until his death. (*Id*. at pp. 774-775.) As did *Miller*, *Sancha* recognized " '[t]he essential basis of a putative marriage . . . is a belief in the existence of a valid marriage.' " (*Sancha*, at p. 777.) *Sancha* upheld the claimant's putative spouse status, concluding substantial evidence supported the trial court's finding that the claimant "*honestly and reasonably* believed" herself to be the decedent's wife (*id*. at p. 778, italics added).

These decisions illustrate that, in the putative spouse context, the reasonableness of a party's belief may legitimately inform the subjective good faith inquiry. *Miller* considered the unreasonableness of the plaintiff's actions in finding an absence of subjective good faith, while *Sancha* recognized that the reasonableness of the putative spouse's belief served to bolster her credibility in establishing good faith.

We acknowledge that, after *Vryonis*, the Legislature repealed former section 377 of the Code of Civil Procedure and former 4452 of the Civil Code and reenacted (and amended) their contents in Code of Civil Procedure section 377.60 and Family Code section 2251, respectively, without seeming to reject *Vryonis*'s reasonable person test. But the Legislature's failure to respond to that Court of Appeal decision is not persuasive evidence of the implicit approval of the decision's reasonable person test, given the decades of previous California Supreme Court and other Court of Appeal decisions evaluating the good faith requirement pursuant to a purely subjective standard. Indeed, it would be just as logical to infer that the Legislature, if it considered the matter at all, might simply have acquiesced in the understanding that the reasonableness of an alleged

18

putative spouse's belief is properly considered as one factor informing the good faith inquiry, and that courts will continue to refine the putative spouse doctrine and self-correct when appropriate. (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1213; *County of Los Angeles v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 404.) Moreover, where, as here, there appears no evidence that *Vryonis*'s application of a reasonable person test was ever brought to the Legislature's attention, the significance of the Legislature's failure to respond to the test is diminished even further. (See *County of Los Angeles*, at p. 404.)[12]

To summarize, section 377.60(b) defines a putative spouse as "the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid." The good faith inquiry is a subjective one that focuses on the actual state of mind of the alleged putative spouse. While there is no requirement that the claimed belief be objectively reasonable, good faith is a relative quality and depends on all the relevant circumstances, including objective circumstances. In determining good faith, the trial court must consider the totality of the circumstances, including the efforts made to create a valid marriage, the alleged putative spouse's personal background and experience, and all the circumstances surrounding the marriage. Although the claimed belief need not pass a reasonable person test, the reasonableness or unreasonableness of one's belief in the face of objective circumstances pointing to a marriage's invalidity is a factor properly considered as part of the totality of the circumstances in determining whether the belief was genuinely and honestly held.

---

[12]    We hereby disapprove *In re Marriage of Vryonis*, *supra*, 202 Cal.App.3d 712, and its progeny to the extent they are inconsistent with the views expressed herein.

DISPOSITION

The trial court granted summary judgment based on the erroneous assumption that good faith must be tested under the reasonable person standard set forth in *Vryonis*, *supra*, 202 Cal.App.3d 712.  We affirm the judgment of the Court of Appeal, which concluded to the contrary.

**BAXTER, J.**


WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Ceja v. Rudolph & Sletten, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 194 Cal.App.4th 584
**Rehearing Granted**

_____

**Opinion No.** S193493
**Date Filed:** June 20, 2013

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Mary Jo Levinger

_____

**Counsel:**

The Arns Law Firm, Robert S. Arns, Jonathan E. Davis, Steven R. Weinmann and Kevin M. Osborne for Plaintiff and Appellant.

Grace Ganz Blumberg as Amicus Curiae on behalf of Plaintiff and Appellant.

LeClairRyan, Robert G. Harrison, Gary P. Simonian; Rankin, Sproat, Mires, Beaty & Reynolds, Michael R. Reynolds and Lisa T. Ungerer for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jonathan E. Davis
The Arns Law Firm
515 Folsom Street, 3rd Floor
San Francisco, CA  94105
(415) 495-7800

Robert G. Harrison
LeClairRyan
888 South Figueroa Street, Suite 1800
Los Angeles, CA  90017
(213) 488-0503