Filed 5/23/14  Estate of Issa CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| Estate of MURCHED MIKE ISSA, Deceased. | D063244 |
| SABAH E. MALEK, | |
| Petitioner and Respondent, | (Super. Ct. No. 37-2011-00150332- PR-EB-NC) |
| v. | |
| MAY ISSA LORAH et al., | |
| Objectors and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Richard G. Cline, Judge.  Affirmed.


Law Office of Joseph M. Kar, Joseph M. Kar; Law Offices of Gregory R. Ellis and Gregory R. Ellis for Objectors and Appellants.

Steven S. Alkema for Petitioner and Respondent.

INTRODUCTION

May Issa Lorah (May) and Marwan Mark Issa (Marwan) appeal an order establishing Sabah E. Malek (Sabah) is entitled to status as the putative spouse of their deceased father, Murched Mike Issa (Murched), and estopping them from asserting the invalidity of the marriage in pending probate proceedings.[1] May and Marwan (collectively appellants) contend: (1) the trial court did not have jurisdiction under Health and Safety Code section 103450 to determine putative spouse status; (2) there is no substantial evidence to support the court's finding of putative spouse; and (3) estoppel does not apply to the facts presented in this case. We find no merit in these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

When Sabah met Murched through mutual friends in Lebanon in 2002, Sabah was 52 years old and a highly educated professor of mathematics teaching in her home country of Lebanon. She obtained numerous degrees from Lebanese University in subjects such as mathematics and computer science and later attended American University of Beirut where she received a graduate degree in education and a teaching diploma. She passed a test of English as a foreign language and studied English literature to improve her English. Sabah taught mathematics and physics for 36 years and contributed to several mathematics textbooks used in the local schools. She led a busy,

---

[1]     Because a number of the parties and witnesses share similar names, we use first names for clarity. No disrespect is intended.

2

happy and contented life living as a single woman with her mother. Although she had relatives, including a brother, who lived in the United States, Sabah never considered going to the United States other than possibly as a tourist.

Murched was a naturalized United States resident who had lived in the United States for 29 years. He had four children with his first wife (two girls and two boys) and was a successful businessman who travelled frequently. After Murched's first wife passed away in 2001, he felt "emptiness in [his] life and in [his] heart]." He missed the companionship and love of a spouse and he wanted to find someone with whom he could travel.

B

Mutual acquaintances introduced Murched and Sabah in September 2002 while Murched was visiting old friends in Lebanon. Murched and Sabah immediately "hit it off." Murched called Sabah a few days after their introduction to arrange for another date. Throughout the next month, they saw each other every few days and traveled together locally. Murched introduced Sabah to family members who lived in Lebanon. Sabah began having feelings for Murched and believed he was developing feelings for her as well.

Eventually, on November 2, 2002, Murched proposed marriage. He asked Sabah to marry him both in private and in the presence of her mother, as is customary. Murched informed May of his intention to marry Sabah.

They celebrated their engagement in Lebanon. Camil Saab (Camil), a family friend, met Sabah at a social gathering at the home of Camil's parents in Lebanon. He

3

understood Sabah and Murched were engaged. Camil was also going through the process of obtaining an alien fiancée visa to bring his future wife to the United States from Lebanon. He discussed the process with Murched, including how to convert to permanent residency after marriage.

Murched returned to the United States a few days later, but he told Sabah he would take care of everything required to bring her to the United States. This included obtaining a fiancée visa (also known as a K-1 visa), which allows an alien fiancée to enter the country for the purpose of marrying a United States citizen. Sabah did not know how to obtain such a visa and did not investigate what was required. She relied on Murched, who assured her he would take care of everything. They continued to communicate by telephone, e-mail and letters after he left.

C

Consistent with his promise, Murched contacted an attorney and arranged for the preparation and completion of an application for a fiancée visa, which he sent to Sabah for signature. Under penalty of perjury, Murched confirmed he intended to marry Sabah within 90 days of her arrival in the United States. He described in his declaration they would be "wed at City Hall," and thereafter "have a church ceremony and a large reception inviting all of my family and friends." Murched's daughter, May, also submitted a declaration describing how, after speaking with Sabah on the telephone, May believed Sabah "is an exceptional human being and truly cares for my father" and she planned to attend the wedding.

4

Sabah's brother, Michael Malek (Michael), lives in New York. He came to the United States on a student visa in 1976, received a degree in civil engineering in 1982 and became a citizen in 1984. When Michael learned his sister was engaged to Murched, he spoke to Murched by telephone and arranged to meet in California around Christmas because Michael was planning to visit friends on the west coast. Murched, along with Marwan, met Michael and went to dinner in Los Angeles. Murched spoke highly of Sabah and said he was in the process of filing a fiancée visa. Michael introduced Murched to his friends as Sabah's future husband.

After the visa was approved, Sabah made arrangements to leave Lebanon. She said good-bye to her friends and family and gave notice at the school where she was teaching.

D

Sabah came to the United States in August 2003 and initially stayed with Michael in New York until Murched could come to meet her. When Murched arrived in September 2003, he stayed with Michael and Sabah. Murched and Sabah slept in separate bedrooms, as was the custom. When Michael asked about the wedding arrangements so he could plan to attend, Murched told Michael he wanted Sabah to meet his son and daughter in California and then marry in Las Vegas, Nevada where it was easiest and fastest to marry. Murched told Sabah they only needed to complete and sign some documents, submit them to a clerk and pay a fee to marry in Las Vegas.

Murched, Sabah and Michael traveled to California where they stayed at Murched's residence in Carlsbad. Murched and Sabah again slept in separate rooms.

5

Over the next two days, Murched introduced Sabah to his children and grandchildren as his fiancée and his future wife. Sabah presented gold gifts from Lebanon to May and her daughters because it is Lebanese custom for the bride to give gifts to the groom's family.

Murched, Sabah and Michael traveled to Las Vegas by car. When they arrived, Murched booked two rooms, one for Sabah and Michael and one for himself for the first night.

The following morning, September 15, 2003, the trio went to the County Clerk's office, which they called "City Hall." Sabah and Murched completed paperwork and then waited in line. Others in the office appeared to be there to get married. Some were dressed formally in white gowns and suits or tuxedos.

Neither Sabah nor Michael knew what to expect of a civil marriage in Las Vegas. Lebanon does not recognize civil marriage, so Sabah relied on what Murched told her. He said they would submit an application, pay a fee and then be considered married. As he had explained, they completed and signed paperwork, which they gave to a clerk. Murched paid a fee and was given documents in return. Murched then told Sabah and Michael the marriage was complete and legal documents would be sent by mail. Murched embraced Sabah and she cried while Michael congratulated them.

They went to a Mediterranean restaurant to celebrate. Murched told Sabah they would have a ceremony with his daughter Mona Wilcox (Mona), which Sabah understood to be a social celebration, based upon the Arabic translation of the word. Murched called Mona who lived in the area, and asked her to join them. When she arrived, Murched told her she should congratulate them because they were married.

6

Mona congratulated them, they had a toast, and pictures were taken. Michael gave Murched an expensive watch as a gift. They then went to Mona's house where Sabah presented gifts to Mona and her children. When they returned to the hotel, Sabah and Murched retired to a room together, which was the first time they shared a room since Sabah came to the United States.

Sabah and Murched returned to Carlsbad where they lived as a married couple until Murched's death on November 12, 2010. In October 2003, one of Sabah's cousins hosted a reception in Detroit with other family members to celebrate her marriage. Although some of the decorations incorporated a Halloween theme due to the time of year, the hostess made a speech congratulating and toasting the couple, and asking them to cut the cake. Pictures were taken of Murched and Sabah cutting the cake and feeding it to each other. Sabah understood the celebration with Mona and the Detroit celebration constituted ceremonies, based on the Arabic translation of the word, which is a social celebration.

Murched later presented Sabah with a marriage certificate. Sabah did not fully examine the certificate, but put it in a drawer for safekeeping.

With the help of an attorney, Murched and Sabah prepared an application to register permanent residence for Sabah on the basis they were married. Although Sabah believed they were married on September 15, 2003, the date of marriage listed on the application was November 1, 2003 and it was signed by Mona as the official performing the marriage. The petition was approved and Sabah was granted conditional permanent resident status. A few years later, Sabah and Murched filed a third immigration petition

to remove the conditions on residence. Both verified, consistent with the marriage certificate, they were married in Las Vegas on November 1, 2003 and remained married.

E

Over the years, friends with whom Murched and Sabah regularly socialized understood they were married. Murched introduced Sabah as his wife. The couple spent time with Murched's children and grandchildren for holidays and celebrations.

Murched introduced Sabah to his personal physician and the physician's staff as his wife. She attended medical appointments with him and they acted like a couple. The physician only knew Sabah as Murched's wife.

Murched filed joint federal and state tax returns with Sabah from 2003 through the time of his death. Murched informed their accountant Sabah was his wife.

F

Murched died on November 12, 2010 from complications of bladder cancer. The first time Sabah learned there might be a problem with the marriage was after Murched's death when the probate proceedings started.

Sabah became somewhat suspicious of Murched's children when May took video of the house before her father's operation and during Murched's hospital stay, a stranger warned Sabah there was a "big plot" against her. After Murched's death, Sabah took some tax and stock papers from the house and gave them to a lawyer.

Only two individuals testified Murched and Sabah were not married. Murched's business partner, Thomas D. Fenchel (Tom), and Murched's daughter, May. Tom testified Murched brought Sabah from Lebanon as a companion. When Tom asked if

Murched had taken care of his financial affairs, Murched responded it was not important because they were not really married. Although Tom represented he was Murched's good friend and Murched relied on him for "every financial decision he ever made in his life," Tom did not know about the Las Vegas trip until later.

May testified she did not know how Murched met Sabah and understood her father "wanted to bring this woman so she could be a travel companion." Although May acknowledged signing the declaration in 2003 stating Sabah was an exceptional human being and she believed her father was in love with Sabah and intended to marry her, she testified she understood Murched "needed" to bring Sabah to the United States and the only way to do so was with the fiancée visa.

May identified Sabah as her father's surviving spouse on his death certificate, but claimed at trial she did so because Sabah threatened to disclose information to her father's friends about her brother acting in gay pornographic movies. She claimed she believed if she listed Sabah on the death certificate she would leave them alone. Sabah denied finding pornographic pictures in the brother's room and denied threatening or blackmailing the family.

G

In January 2011, Sabah filed a petition for appointment of a special administrator for decedent's estate and later filed a petition for probate of will and for letters testamentary requesting her appointment as executor of the estate, to which May and Marwan objected. May and Marwan filed a competing petition for letters testamentary

9

requesting a petition for determination of entitlement to estate distribution in March 2011 asserting Sabah "never had a valid marriage" to their father.

Sabah filed her petition to establish fact of her marriage to Murched in June 2011. The court later granted Sabah's motion for leave to amend her petition to seek relief as a putative spouse if the court determined the marriage was invalid.[2]

The matter was bifurcated with the issue of marriage tried first. After hearing evidence, the court issued a statement of decision determining: (1) Sabah is entitled to status as the putative spouse of Murched because she had "a reasonable and objectively good faith belief that her marriage was valid;" (2) Murched's children are equitably estopped from asserting the invalidity of the marriage because Murched, who knew the marriage was invalid, acted as if it were valid and intended his conduct should be relied upon by Sabah and others whereas Sabah was ignorant of the invalidity of the marriage; and (3) Murched's children are judicially estopped from asserting the invalidity of the marriage because Murched took the position he was legally married to Sabah in immigration and tax filings, which is inconsistent with the position taken by the children in this action.

---

[2] During the course of litigation, May obtained a judgment from a court in Nevada declaring the marriage certificate invalid.

DISCUSSION

I

*A Petition under Health and Safety Code Section 103450*
*Does Not Preclude a Putative Spouse Finding*

Appellants contend a putative spouse claim may not be litigated in a petition brought under Health and Safety Code section 103450. We disagree.

Health and Safety Code section 103450 provides a procedure to judicially establish the fact of a marriage where the marriage was not registered or no certificate could be obtained. The procedure may also be used where a spouse is deceased or is unable to participate in a declaration procedure under Family Code section 425. (*Estate of DePasse* (2002) 97 Cal.App.4th 92, 105, overruled on other grounds *Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1126 (*Ceja*).)

Initially, this procedure was used to establish the fact of a marriage, but not the validity of a marriage. (*Estate of DePasse*, *supra*, 97 Cal.App.4th at p. 105.) In 2006, however, Family Code section 309 was amended to allow a party to a marriage to use the Health and Safety Code section 103450 procedure to determine the validity of the marriage if the other party to the marriage denies the marriage or refuses to join a declaration of marriage. (Fam. Code, § 309.) Appellants do not acknowledge this statutory amendment.

When a marriage is invalid due to some legal infirmity, "an innocent party nevertheless may be entitled to relief under the long recognized protections of the putative marriage doctrine." (*In re Marriage of Vryonis* (1988) 202 Cal.App.3d 712, 717,

11

overruled on other grounds *Ceja*, *supra*, 56 Cal.4th at p. 1126.)  "Relief under the putative spouse doctrine is not precluded even if the circumstances do not establish either a void or voidable marriage."  (*In re Domestic Partnership of Ellis & Arriaga* (2008) 162 Cal.App.4th 1000, 1005, overruled on other grounds *Ceja*, at p. 1126.)

Family Code section 2251 is one of several statutes codifying California's judicially developed putative spouse doctrine.  (*Ceja*, *supra*, 56 Cal.4th at pp. 1120-1121 & fn. 5.)  It states in pertinent part, "[i]f a determination is made that a marriage is void or voidable and the court finds that either party or both parties believed in good faith that the marriage was valid, the court *shall*: [¶] . . . [d]eclare the party or parties to have the status of a putative spouse."  (Fam. Code, § 2251, subd. (a)(1), italics added.)

Courts apply the putative spouse doctrine in a variety of actions and proceedings including dissolution actions (*In re Marriage of Tejeda* (2009) 179 Cal.App.4th 973, 978-979, 985 ["the mandate of [Family Code] section 2251 must be applied, without regard to guilt or innocence, when the court makes the predicate findings that (1) the marriage is void or voidable, and (2) at least one party to the union maintained a good faith belief in the validity of the marriage"]; *In re Domestic Partnership of Ellis & Arriaga*, *supra*, 162 Cal.App.4th at pp. 1003, 1008 [trial court erred in dismissing petition for dissolution of a domestic partnership without permitting an opportunity to plead a good faith belief in the existence of a registered domestic partnership under putative spouse doctrine]), probate proceedings (*Estate of Leslie* (1984) 37 Cal.3d 186, 191) and wrongful death (*Ceja, supra,* 56 Cal.4th at p. 1115).

In this case, Sabah petitioned the court to establish the fact of her marriage after appellants alleged during the probate proceedings that Sabah and Murched were never married. In response to the petition, appellants alleged there was no valid marriage. Sabah thereafter sought and obtained leave of court to amend the petition to specify she alternatively sought relief under the putative spouse doctrine if the court determined the marriage was invalid. Given these circumstances, we conclude there is no procedural impediment to the court's ability to determine whether or not Sabah was entitled to putative spouse status in the context of determining the fact or validity of marriage based on a petition under Health and Safety Code section 103450.

II

*Substantial Evidence Supports the Court's Finding*
*Sabah is Entitled to Putative Spouse Status*

A

If a court determines a marriage is void or voidable and finds a party "believed in good faith that the marriage was valid, the court shall: [¶] . . . [d]eclare the party or parties to have the status of a putative spouse." (Fam. Code, § 2251, subd. (a)(1).) The Supreme Court recently analyzed whether a subjective or objective standard should be applied to determine the good faith belief necessary for putative spouse status. (*Ceja*, *supra*, 56 Cal.4th at pp. 1119-1121.) After reviewing precodification case law, the court concluded "[t]he good faith inquiry is a *subjective* one that focuses on the actual state of mind of the alleged putative spouse." (*Ceja*, at p. 1128, italics added.)

13

The court overruled a line of cases holding good faith should be tested by an objective standard examining "whether the facts surrounding the marriage would cause a hypothetical reasonable person to believe in its validity." (*Ceja*, *supra*, 56 Cal.4th at p. 1126) However, it determined "the reasonableness of a party's belief may legitimately inform the subjective good faith inquiry." (*Id.* at pp. 1127-1128.) "Although the claimed belief need not pass a reasonable person test, the reasonableness or unreasonableness of one's belief in the face of objective circumstances pointing to a marriage's invalidity is a factor properly considered as part of the totality of the circumstances in determining whether the belief was genuinely and honestly held." (*Id.* at p. 1128.) Other factors the court should consider include "the efforts made to create a valid marriage, the alleged putative spouse's personal background and experience, and all the circumstances surrounding the marriage." (*Ibid.*)

Appellants acknowledge judicial decisions are generally given retroactive effect. (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978.) They do not dispute *Ceja*, *supra*, 56 Cal.4th 1113 applies to this case. They ask us to remand, however, for retrial under the subjective standard of good faith as articulated by the Supreme Court. We are not persuaded.

Unlike in *Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 372, footnote 21, where the court determined there was evidence a party's trial strategy was weakened by a subsequent Supreme Court decision, appellants point to no evidence in the record their trial strategy was weakened as a result of the trial court's application of an objective standard for good faith as opposed to a subjective standard of good faith. There is no

14

indication they made a strategy decision to omit evidence that could be relevant to the Sabah's subjective belief. Indeed, Sabah bore a more substantial burden by proving she had an objective good faith belief in her marriage than if the trial court had applied the subjective standard expressed by the Supreme Court.

B

We will uphold a trial court's finding of putative spouse status if supported by substantial evidence. (*Ceja*, *supra*, 56 Cal.4th at p. 1119.) In determining if substantial evidence exists to sustain a trial court's factual finding, "the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

In this case, after hearing several days of testimony from numerous witnesses and considering additional documentary evidence, the trial court determined Sabah had a reasonable and honest belief she was married to Murched in Las Vegas and the evidentiary picture she painted to be true. The court rejected the assertion of appellants that Sabah and Murched engaged in a fraudulent plan to obtain permanent residency for Sabah in the United States and that she lived with Murched as husband and wife, including attending family gatherings, knowing they were not legally married for the purpose of living a life of luxury and excitement.

15

The court determined Sabah and her witnesses "were credible and, except for minor inconsistencies, presented a coherent and credible story. Having in mind that [Sabah] was obviously and reportedly recovering from a serious illness and harsh regimen of treatment, she was a steadfast and totally credible witness. In spite of opposing counsel's daunting efforts to discredit, undermine and confuse her, [Sabah] was unwavering." On the other hand, the court found May's testimony incredible because it was contradicted by numerous witnesses and impeached by written evidence.

We accept the trial court's assessment of the credibility of the witnesses and will not substitute it with our own. (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329.) The trial court was in the best position to assess the nature and tenor of the testimony, the demeanor of the witnesses and the impeaching factors. The record here shows the court properly performed its task in this regard. "That the . . . court reasonably could have assessed . . . credibility less favorably or that our court could reasonably make a different assessment of credibility is not sufficient grounds for reversal." (*Ibid.*)

Appellants argue Sabah's testimony was unreasonable and incredible because she thought a ceremony occurred. The court determined that, although Sabah was smart and educated, she was naïve and trusting when it came to Murched. She was ignorant of the requirements of an official marriage, particularly in the United States, and she placed her trust in Murched. The court found Sabah and Murched went to Las Vegas on September 14, 2003, for the purpose of getting married with Sabah's brother as the family chaperone and witness. The court noted although Sabah was somewhat ambiguous about whether a ceremony was required, her understanding of the Arabic translation of the

16

word included a social celebration, both of which occurred. The court determined Sabah reasonably and in good faith believed the necessary procedures had occurred.[3]

Appellants also argue the premarital agreement drafted by Murched's attorney in September or October of 2003 suggests Sabah could not have reasonably believed she was married on September 15, 2003. However, Sabah testified she never spoke to the attorney about a premarital agreement. Although the trial court found the attorney was a credible witness, he had a poor memory except where matters were clearly shown by documents in his file and he was vague as to when he had conversations with either Sabah or Murched. Whether Murched discussed this premarital agreement before or after the September 15, Las Vegas trip has no bearing on whether Sabah reasonably and in good faith believed they were married on this date.

Appellants finally argue Sabah should have known her marriage was invalid when she learned about the marriage certificate dated November 1, 2003. Although both Sabah and Murched certified in immigration documents they were married on November 1, 2003, the court noted Sabah took a passive role in the document preparation and the only evidence supporting this date as the date of marriage is the certificate itself. The court noted Murched's daughter, Mona, who signed the certificate, as the official performing the marriage using the title "Reverend," was present during the trial but did not testify to

---

[3]    Appellants assert Sabah's belief should be viewed as unreasonable because she studied English literature in college. We find no basis to override the trial court's assessment of credibility. We also note Sabah testified she studied literature as a means to improve her English. There is no indication her testimony about her understanding of the word "ceremony" was untruthful or unreasonable.

17

dispel the uncertainties surrounding the execution of the marriage certificate and Murched's intentions. Finding this "highly suspicious" the court drew negative inferences against appellants. As a result, the court concluded Murched procured the marriage certificate and provided it to the attorney knowing it was false and caused him to submit it to the Immigration and Naturalization Service whereas Sabah was not aware of the existence of the marriage certificate or its contents. The court also found it "highly probable" May and her sister Mona participated to some degree in the fraud.

We conclude substantial evidence supports the trial court's findings Sabah had a good faith belief in the validity of her marriage, under either a subjective or objective standard.

### III

### *Estoppel*

Four elements are required to apply the doctrine of equitable estoppel: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he [or she] must rely upon the conduct to his [or her] injury.' " (*Long Beach v. Mansell* (1970) 3 Cal.3d 462, 489.) If a decedent would be estopped from denying the validity of a marriage, the heirs may likewise be estopped. (*In re Estate of Davis* (1940) 38 Cal.App.2d 579, 585.)

Our review of a trial court's decision regarding the application of equitable estoppel involves a two-step process. First, we independently review whether the factual

18

findings provide a legally sufficient basis for estoppel. Second, assuming estoppel may be applied based upon the facts as found, the court's decision of whether or not it should apply estoppel is reviewed for abuse of discretion. (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 483-484.)

In this case, we conclude there is a legally sufficient basis for estoppel and the trial court properly exercised its discretion to apply equitable estoppel to preclude appellants from asserting the marriage between Sabah and Murched was invalid. As discussed, the court found Murched procured a false marriage certificate and provided it to the attorney knowing it was false and caused him to submit it to the Immigration and Naturalization Service. He held himself out both socially and in tax documents as the husband of Sabah. As a result, governmental entities acted upon these representations to his benefit although he knew he was not legally married and was not acting in good faith.

The court found there was nothing to put Sabah on notice she was not legally married from September 15, 2003, until the time of Murched's death and she reasonably and in good faith relied on the representations of a valid marriage. However, Murched did not act so honorably. He did not put Sabah on his business health plan and informed his business partner she was merely an enjoyable companion, not a wife. We conclude appellants are equitably estopped from asserting the invalidity of the marriage.

Appellants assert estoppel is not appropriate because "the fact of marriage cannot be created through estoppel." However, "estoppel does not make valid the thing complained of, but merely closes the mouth of the complainant." (*In re Estate of Davis*, *supra*, 38 Cal.App.2d at p. 585.) Here, the evidence shows Murched induced Sabah to

19

come to the United States to be his wife.  He took her to Las Vegas for the purpose of marriage and thereafter held her out as his spouse for his own benefit.  The trial court's order does not make the marriage valid, but precludes Murched's children from asserting invalidity of the marriage in the remaining probate proceedings.  We find no abuse of discretion in applying estoppel principles under these circumstances. [4]

DISPOSITION

The order is affirmed.  Respondent is entitled to costs on appeal.


MCCONNELL, P. J.

WE CONCUR:

NARES, J.

IRION, J.

---

[4]    Given our conclusions, we do not reach the issue of whether or not judicial estoppel should apply to statements submitted to administrative agencies such as the Immigration and Naturalization Service.